# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 7428 | **DATE** | 2/16/2001 |
| **CASE TITLE** | Kinesoft Development Corp. vs. Softbank Holdings Inc. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION AND ORDER.** Defendants' motion for summary judgment is granted as to Count III of the Second Amended Complaint and the plaintiff's claims for lost profits, and denied as to Counts I, II, IV, V and the plaintiff's claims for compensatory and punitive damages. The matter is set for a status hearing on 02/27/01 at 9:00 a.m. At that time, the Court will set a trial date and a schedule for filing motions in limine, proposed voir dire questions, and jury instructions.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | FEB 20 2001 | |
| | Notified counsel by telephone. | date docketed | |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 2/16/2001 | |
| | | date mailed notice | |

Document Number 64

courtroom deputy's initials JJK

DEPT DOCKETING
01 FEB 16 PM 2: 04

Date/time received in central Clerk's Office

JJK
mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KINESOFT DEVELOPMENT
CORPORATION,

        Plaintiff,

    vs.

SOFTBANK HOLDINGS INC. and
RONALD D. FISHER,

        Defendants.

Case No. 99 C 7428

Magistrate Judge
Sidney I. Schenkier

## MEMORANDUM OPINION AND ORDER

This is the Court's second summary judgment opinion in this case, which arises out of disputes between plaintiff, Kinesoft Development Corporation ("Kinesoft"), and defendant Softbank Holdings Inc. ("Softbank"), concerning the performance of the terms of a 1995 Shareholders Agreement ("the Shareholders Agreement") and a 1997 Settlement Agreement ("the 1997 Agreement"). In its second amended complaint, Kinesoft alleges breach of the Shareholders Agreement (Count I) and the 1997 Agreement (Count II) by Softbank; breach of fiduciary duty by Softbank (Count IV) and Ronald D. Fisher, the Vice Chairman of Softbank (Count V); and tortious interference with prospective economic advantage by Softbank (Count III). The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, and venue is proper in this Court under 28 U.S.C. § 1391.[1]

---

[1] There is complete diversity of citizenship between the parties and the matter in controversy exceeds the sum of $75,000 exclusive of interests and costs (Pl.'s Rule 56.1(b)(3)(A) Response ("Pl.'s Resp. Facts") ¶ 3). Venue is proper in this Court because the defendants have transacted business in this county, and because the agreements relevant to this action expressly provide for jurisdiction in this county (Pl.'s Resp. Facts ¶ 4).

In its earlier opinion ("Kinesoft I"), the Court granted Kinesoft's motion for summary judgment on Softbank's counterclaim. In this opinion, the Court addresses the motion for summary judgment filed by the defendants (doc. # 47), which seeks a judgment disposing of all five counts of the second amended complaint. For the reasons that follow, defendants' motion is granted in part and denied in part.[2]

## I.

Summary judgment is proper if the record shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *See Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090 (7th Cir.1999). A genuine issue for trial exists only when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Liberty Lobby*, 477 U.S. at 249-50; *Flipside Prods., Inc. v. Jam Prods. Ltd.*, 843 F.2d 1024, 1032 (7th Cir. 1988).

Softbank has complied with Local Rule 56.1(a), which requires a party moving for summary judgment to file a statement of material facts as to which the moving party contends there is no genuine issue. As required, Softbank's statement of material, undisputed facts included "references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." UNITED STATES DIST. COURT, N. DIST. OF ILL. LR 56.1. All properly supported material facts set forth in a summary judgment motion are deemed admitted unless properly controverted by the opposing party. *See id.*; *see also Corder v. Lucent Techs., Inc.*, 162 F.3d

---

[2]By the parties' consent, on January 11, 2000, this case was reassigned to this Court, pursuant to 28 U.S.C. § 636 (c)(1) and Northern District of Illinois Local Rule 73.1(b), to conduct any and all proceedings, and to enter final judgment (*see* Doc. ## 13 and 14).

924, 927 (7th Cir. 1998); *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 453 (7th Cir. 1994); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921-22 (7th Cir. 1994)

Thus, once Softbank moved for summary judgment, and offered evidentiary materials to support its factual allegations, Kinesoft could not merely rely on its denials in the pleadings to show that a genuine issue of material fact existed. *See Shermer v. Illinois Dep't of Transp.*, 171 F.3d 475, 477 (7th Cir. 1999) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). Rather, Kinesoft's obligation is to "come forward with appropriate evidence demonstrating that there [was] a pending dispute of material fact." *Waldridge*, 24 F.3d at 921; *see also Vector-Springfield Properties, Ltd. v. Central Illinois Light Co., Inc.*, 108 F.3d 806, 809 (7th Cir. 1997). To meet this burden, Kinesoft must counter the evidence submitted by Softbank with materials of "evidentiary quality" (*e.g.*, depositions or affidavits) that create a factual issue. *Adler v. Glickman*, 87 F.3d 956, 959 (7th Cir. 1996). While the evidence offered need not be in a form that would be admissible at trial, *see Liu v. T & H Mach., Inc.*, 191 F.3d 790, 796 (7th Cir. 1999), the evidence must identify a specific, genuine issue for trial. *See Shermer*, 171 F.3d at 477.

After careful review of the parties' Rule 56.1 statements, the material facts are set forth below. As will be clear from the discussion, while many of these facts are undisputed, many facts material to certain of plaintiff's claims remain in genuine dispute.[3]

---

[3]The internal citation format used in Kinesoft I will be used in this opinion as well. Accordingly, the pleadings will be cited as follows. The second amended complaint will be cited as "Second Am. Compl. ¶ __," and the answer will be cited as "Ans. ¶ __." References to the parties' Rule 56.1 Statements of Fact, Responses and Additional Facts will be cited as follows: Defendants' Rule 56.1(a)(3) Statement of Undisputed Material Facts will be cited as "Defs.' Facts ¶ __; plaintiff's Rule 56.1(b)(3)(A) Response will be cited as "Pl.'s Resp. Facts ¶ __"; plaintiff's Rule 56.1(b)(3)(B) Counter-Statement of Additional Undisputed Facts will be cited as "Pl.'s Add'l Facts ¶ ___; and defendant's Rule 56.1(a) Reply Statement of Facts will be cited as "Defs.' Reply Facts ¶ ___. Where there is no dispute between the parties regarding a fact statement, the Court will cite to the statement made by the party asserting the fact (*e.g.*, if the plaintiff makes a factual assertion in its statement of additional facts that the defendant does not dispute, the Court will cite to the plaintiff's statement, not the defendants' reply); where there is a genuine dispute of a material fact, however, the Court will cite to the statement of the party disputing that fact (*e.g.*, if the defendants dispute a statement made by the plaintiff

## II.

### A.    The Shareholders Agreement.

In May 1995, in exchange for 41 percent of Kinesoft's common stock, Softbank paid $12 million to Kinesoft and its two principal shareholders:  Peter Sills, Kinesoft's Chief Executive Officer ("CEO"); and Peter Mason, who at one time was Kinesoft's attorney and who also served as a Kinesoft director from approximately May 25, 1995 until January 2000 (Defs.' Resp. Facts ¶ 5). The remaining 59 percent of Kinesoft's common stock was owned proportionately by Mr. Sills, who currently owns 58.75 percent of the Kinesoft common stock (Final Pretrial Order, § III (4)), and Mr. Mason, who currently owns .25 percent of Kinesoft's common stock (Final Pretrial Order, § III (8); Pl.'s Add'l Facts ¶ 68).

On May 25, 1995, Mr. Sills and his former partner, Mark Achler, together with Kinesoft, Softbank and Softbank Corporation (Softbank's parent), entered into the Shareholders Agreement (Defs.' Facts ¶ 6).[4] The Shareholders Agreement requires Kinesoft to have a Board of Directors, and provides for the manner of their selection:  "[e]ach Shareholder will vote or cause to be voted all shares of Common Stock owned by it for the election of nominees so designated as directors at any annual or special meeting called for such purpose" (Shareholders Agreement § 2(a)).   The Shareholders Agreement further provides that "any corporate action" is to be taken by vote of the Board and authorized by no less than a majority of the directors present at any meeting at which a quorum is present or "by written consent of all directors of the Company except as may be otherwise

---

in its statement of additional facts, the Court will cite to the defendants' reply).

[4]Softbank Corporation previously was named as a defendant, but was dismissed from this action on February 28, 2000 (Doc. # 24).

required by paragraph (c) . . . or by law" (*Id.* at § 2(b)).  Section 2(c) of the Shareholders Agreement

provides that certain corporate action (*e.g.,* any capital expenditure of $500,000 or more) cannot be

taken by Kinesoft unless ***all*** (rather than a majority) of the directors present at a Board of Directors

meeting vote in favor of that action (Defs.' Ex. 4, at § 2(c)(iii)); (Defs.' Facts ¶ 6).  The parties agree

that the Shareholders Agreement gives Softbank and Mr. Sills the right to designate persons for

election to the Kinesoft Board (Pl.'s Add'l Facts ¶ 76; Defs.' Reply Facts ¶ 76).

The parties have identified five persons who served as members of the Kinesoft Board of

Directors at all times relevant to this action.  At those times, Mr. Fisher and Dr. T. A. Dolotta were

Softbank's designated Directors to the Kinesoft Board (Pl.'s Add'l Facts ¶ 76).  Messrs. Sills, Mason

and Achler were Kinesoft's designated Directors (*Id.*).  None of these five directors were elected at

a formal board meeting (*Id.*; Defs.' Reply Facts ¶ 76); rather, all five were placed on the Board by

a written, "formal unanimous consent of the Board of Directors" (Pl.'s Resp. Facts ¶ 6; Defs.' Reply

Facts ¶ 76; Final Pretrial Order, § III (7)).  When Kinesoft hired a new president and moved the

company from Chicago, Illinois to Austin, Texas, no formal Board meeting was held to approve

these acts: the communications all were through e-mails and telephone calls (Pl.'s Add'l Facts ¶ 68).

**B.      The 1997 Agreement.**

On May 25, 1995, Kinesoft and Softbank entered into the "Game Porting Agreement" (Defs.'

Facts ¶ 8).  Under the terms of that agreement, Softbank was to provide Kinesoft with a certain

number of console games to be "ported" to a PC platform; "porting" involves translating pre-existing

video games from the console platform to the personal computer platform (*Id.* ¶¶ 7-8).  Kinesoft sued

Softbank for breach of the Game Porting Agreement, and Softbank admits now that it did not

provide Kinesoft with the agreed upon number of games (Defs.' Facts ¶ 9).  That lawsuit was

resolved when Softbank and Kinesoft entered into a settlement agreement on June 12, 1997 – the 1997 Agreement that is a subject of this lawsuit (*Id.* ¶ 9). As consideration for the 1997 Agreement, Kinesoft released all claims against Softbank Corporation under the Game Porting Agreement (*Id.*).

Under the terms of the 1997 Agreement, Softbank was required to make "Initial" and "Subsequent Advances" to Kinesoft totaling $10 million, as follows: (1) $5 million on June 12, 1997, the date the 1997 Agreement was executed; (2) $2.5 million on April 1, 1998; and (3) $2.5 million on October 1, 1998 (Defs.' Facts ¶ 10). Softbank made each of the Initial and Subsequent Advances on the designated dates (Defs.' Facts ¶ 10).

The June 1997 Agreement also provides that, in certain circumstances, Softbank "shall make available" to Kinesoft up to $15 million in "Capital Advances" (Defs.' Ex. 9, at § 2.01(d)-(e)). Sections 2.01(d) and (e) of the 1997 Agreement pertain to Capital Advances. Because those provisions are central to this case we quote them in full:

> (d)   In addition to the Advances set forth in paragraphs (a), (b) and (c) above, SOFTBANK shall make available to Kinesoft an aggregate of FIFTEEN MILLION DOLLARS ($15,000,000), which shall be comprised of capital advances ("*Capital Advances*") to be made by SOFTBANK to Kinesoft in accordance with this subsection (d) and subsection (e) below, from time to time and at Kinesoft's request, for expenses and transactions not in the ordinary course of business and pursuant to the "Business Plan" (as defined below). SOFTBANK's obligation to make Capital Advances is subject to the satisfaction of the conditions set forth in <u>subsection (e)</u> below and is separate from and in addition to its obligations to make the Initial Advance and the Subsequent Advances.

> (e)   Any request for Capital Advances by Kinesoft shall be governed by the following:

> > (i)   Capital Advances shall be for purposes reasonably calculated to further Kinesoft's pursuit of becoming a leader in the interactive entertainment industry by, among other things, (x)

using its technology to engage in the development of game and other interactive titles on behalf of third-party creators and with respect to its own titles, (y) licensing its technologies and proprietary content to others, and (z) publishing its technologies and proprietary content for itself and others (the "Business Plan"). Without limiting the foregoing, the following capital transactions and expenditures shall be deemed to be in furtherance of the Business Plan:

(A)    the acquisition of existing companies, divisions, or operations with computer software tools and other key technologies, products, licenses, content, game or other interactive titles, intellectual property or personnel;

(B)    the acquisition (by license or otherwise) of computer software tools and other key technologies, products, content, game or other interactive titles, and intellectual property;

(C)    extraordinary costs associated with the hiring of key individuals in connection with the development of technologies, content and markets for Kinesoft's products and services; or

(D)    the acquisition or establishment of significant infrastructure and/or facilities.

(ii)    Kinesoft shall request a Capital Advance by submitting to Softbank a written request therefor in accordance with Section 5.04 (a "Draw Request"), which Draw Request shall set forth: (A) the amount of the requested Advance; (B) a description of the proposed use of the proceeds of such Advance, including information which a prudent corporate director would reasonably request in order to evaluate a proposed corporate action (such as the terms of the proposed transaction and its strategic fit within the Business Plan; information regarding any acquisition target (if applicable) and/or of the technologies, assets, facilities or personnel involved in the transaction; and relevant financial information regarding the expected impact of the transaction on Kinesoft)

and (C) the proposed funding date. SOFTBANK shall respond to a Draw Request as soon as practicable under the circumstances, but not later than 20 Business Days following the date of the Draw Request (and not later than 10 Business Days if such Draw Request is for $2,000,000 or less); and, if such Draw Request is approved pursuant to <u>subsection (iii)</u> below make such Capital Advance to Kinesoft at Kinesoft's direction on the requested funding date, in U.S. dollars and in immediately available funds.

(iii)    In the case of a Capital Advance in excess of $2,000,000, SOFTBANK shall make the Capital Advance described in the applicable Draw Request upon approval thereof by a majority of the board of directors of Kinesoft, which approval shall include the approval of at least one representative of SOFTBANK on such board. In the case of a Capital Advance of $2,000,000 or less, SOFTBANK shall make the Capital Advance described in the applicable Draw Request upon approval thereof by at least one representative of SOFTBANK on the board of directors of Kinesoft. Capital Advances shall be made by SOFTBANK in connection with transactions which are reasonably calculated to achieve the goals set forth in the Business Plan, including transactions of the type described in <u>subsections (i)(A), (B), (C), and (D)</u> above, and SOFTBANK will not unreasonably withhold or delay funding of any appropriate Draw Request. Kinesoft shall be allowed to draw a Capital Advance under this Agreement notwithstanding that Kinesoft may have other sources of financing therefor or may have other funds available to it.

(iv)    if there is a denial of a Draw Request in whole or in part, SOFTBANK shall provide Kinesoft with a detailed explanation of the basis for such denial and the terms upon which SOFTBANK's decision with respect thereto would be reversed.

(Defs.' Ex. 9, at §§ 2.01(d)-(e)) (underlining in original).

Section 5.04 of the 1997 Agreement, which is referred to in Section 2.01(e)(ii), provides the manner that notice is to be given and to whom it is to be directed:

**Section 5.04.  Notice.**  All notices, consents or other communications shall be in writing, and shall be deemed to have been duly given and delivered when delivered by hand, or when mailed by registered or certified mail, return receipt requested, postage prepaid, or when received via telecopy, telex or other electronic transmission, in all cases addressed to the party for whom intended at its address set forth below:

If to SOFTBANK:    SOFTBANK Holdings Inc.
                              * * *
                      Attention:  Ronald D. Fisher

If to Kinesoft:       Kinesoft Development Corp.
                              * * *
                      Attention: Peter Sills, Chairman and Chief Executive Officer

or such other address as a party shall have designated by notice in writing to the other party given in the manner provided by this Section.

(Pl.'s Ex. A, 1997 Agreement § 5.04) (bold face and underlining in original).

The 1997 Agreement also addresses future amendments, modifications or waivers of its terms:

**Section 5.01.  Amendments and Waivers.**  The parties agree to consider proposed amendments or modifications of the terms or provisions of this Agreement but no such proposed amendment shall be binding unless the same shall be in writing and duly executed by the parties hereto.  No waiver of any of the provisions of this Agreement shall be deemed to or shall constitute a waiver of any other provisions hereof.  No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

(Pl.'s Ex. A, 1997 Agreement § 5.01) (bold face and underlining in original).  Finally, the 1997 Agreement also contains a merger and integration clause, which provides as follows:

**Section 5.02.  Entire Agreement.**  This Agreement, together with the Release, sets forth the entire understanding of the parties with respect to the subject matter hereof.  Any previous agreement or understandings between the parties regarding the subject matter hereof are merged into and superseded by this Agreement and the Release.

(*Id.*, § 5.02) (bold face and underlining in original).

## C. Prior Requests for Capital Advances.

Prior to the summer of 1999, Kinesoft made three requests for Capital Advances that Softbank approved – although only two requests were actually funded (Defs.' Facts ¶¶ 20-22). We address each of those requests for Capital Advances in chronological order.

On May 20, 1997, Kinesoft initiated its first request for a Capital Advance by sending an e-mail to Mr. Fisher seeking $250,000 to pay for "extraordinary" expenses relating to hiring (Defs.' Facts ¶ 20; Defs.' Ex. 17). Although there was no proposed funding date included in the initial e-mail (Pl.'s Add'l Facts ¶ 70), Mr. Fisher did not deny the request on that basis. Instead, he noted that a Capital Advance could not be made until the 1997 Agreement was signed (Defs.' Facts ¶ 20; Defs.' Ex. 17). That agreement was signed on June 12, 1997, and by a letter dated June 24, 1997, Kinesoft confirmed the request for a Capital Advance. In the June 24, 1997 letter, Kinesoft asked that the funding be provided immediately (Defs.' Facts, Ex. 9). Thereafter, Softbank approved the request and made the Capital Advance for $250,000 (Defs.' Facts ¶ 20).

In the fall of 1997, Kinesoft initiated a second request for a Capital Advance: this one for approximately $6.5 million to fund the acquisition of two PC games being developed by third parties (Defs.' Facts ¶ 21; Defs.' Ex. 18). On behalf of Softbank, Mr. Fisher and Mr. Mason requested further financial information about these acquisitions (Defs.' Facts ¶ 21). On December 3, 1997, after receiving additional information, Mr. Fisher approved the request (Defs.' Facts ¶ 21; Defs.' Ex. 18). However, Kinesoft's Board of Directors never voted on approval of this request (Pl.'s Add'l Facts ¶ 71), and the funds were never advanced because the Kinesoft acquisition opportunity became unavailable (Defs.' Facts ¶ 21; Defs.' Reply Facts ¶ 71). As with the May 1997 request, Kinesoft's initial request for the $6.5 million advance did not contain a proposed funding date (Pl.'s Add'l Facts

¶ 71; Pl.'s Ex. Q). However, Softbank did not deny the request for a Capital Advance on that basis:

rather, in response to that request, Softbank requested (and Kinesoft provided) specific funding dates

(Defs.' Reply ¶ 71; Defs.' Ex. 18).

On or about May 1, 1998, Kinesoft initiated a third request for a Capital Advance by sending

an e-mail to Mr. Fisher seeking $1.32 million for "capital equipment expenditures" to be made in

two installments (Defs.' Facts ¶ 22; Pl.'s Ex. 20). Again, Kinesoft's request did not include a

proposed funding date; and this time, the request also did not include a description of the proposal,

but it did list the equipment Kinesoft sought to purchase (Pl.'s Add'l Facts ¶ 72). Softbank sought

no further details concerning the proposed acquisition. However, in an e-mail dated May 11, 1998,

Kinesoft specifically requested that Softbank advance the funds within 30 days of Kinesoft's request

(Defs.' Reply Facts ¶ 72; Defs.' Ex. 20). On that same date, Softbank approved the request for a

Capital Advance (and the proposed 30-day funding date), and subsequently advanced the first

installment of approximately $998,000 (Defs.' Facts ¶ 22). The second installment was never paid

because Kinesoft withdrew the request for the balance of that Capital Advance (*Id.*).

**D.      The Introduction of Mr. Levy Into The Relationship.**

On October 27, 1998, Mr. Fisher contacted Mr. Jordan Levy about assisting Softbank in its

dealings with Kinesoft. Mr. Levy was a significant shareholder of Softbank Corporation and "two

or three Softbank funds." (Pl.'s Ex. K, Levy Dep., at 22, 25-26).

In his first overture to Mr. Levy, Mr. Fisher stated as follows:

> . . . as you know we still have an investment in Kinesoft. The games business is not
> an area that I understand particularly well, and I am concerned about the ongoing
> level of investment in the Company. I also think that based on the history I am too
> "understanding" of their problems (read I need a hard-ass!). Is this something that
> you would be interested in helping me on?

11

(Pl.'s Ex. H: 10/27/98 Fisher e-mail to Levy). Mr. Levy indicated his willingness to help, and on October 30, 1998, Mr. Fisher asked Mr. Levy to "join the [Kinesoft] Board and represent Softbank's interests" for the purpose of helping Softbank "figure out where the company is really headed and whether there is any hope of realizing any value from it" (Pl.'s Ex. H: 10/30/98 Fisher e-mail to Levy). On November 2, 1998, Mr. Levy wrote to indicate his agreement to Mr. Fisher's request, and stated his understanding of what his role could entail: "I just want everyone to know that I am taking on the Harvey Keitel role in Pulp Fiction vs being the one who brought this baby to Softbank. I will do everything that I can to help them get successful" (*Id.*: 11/02/98 Levy e-mail to Fisher).[5]

Mr. Sills testified that, during a telephone call in late 1998, Mr. Fisher first advised Mr. Sills and Mr. Spitzer that he would like to put Mr. Levy on the Kinesoft Board of Directors in place of Mr. Fisher (Pl.'s Ex. D, Sills Dep., at 435). Messrs. Sills and Spitzer spoke with Mr. Levy, and thereafter, Mr. Sills informed Mr. Fisher that Kinesoft perceived a conflict of interest with Mr. Levy as the Kinesoft Director representing Softbank's interests (*Id.*, at 435, 437). In March 1999, Mr. Sills interviewed Mr. Levy for a possible seat on Kinesoft's Board, and the two of them discussed Kinesoft's business and strategy (Defs.' Facts ¶ 25). Thereafter, on April 8, 1999, Mr. Sills sent an e-mail to Mr. Fisher which did not specifically raise any conflict issue, but instead addressed different concerns that had arisen from the meeting with Mr. Levy. Mr. Sills wrote that "Jordan led me to believe that Softbank had taken a new strategic direction and therefore would not be honoring its additional funding obligations under [the] June 1997 Agreement" (Defs.' Facts ¶ 25; Defs.' Ex. 23, at KS 01168).

---

[5]In the movie "Pulp Fiction," the actor Harvey Keitel played the role of an individual given the job of cleaning up a bloody mess resulting from a shooting in the back seat of a car.

Mr. Fisher responded that Softbank intended to "honor" its "funding obligations under the 1997 Agreement," but he harbored concerns over whether Kinesoft could achieve the goal of its Business Plan: that is, to become a "leader in the interactive entertainment industry" (Pl.'s Ex. I: 04/26/99 Fisher e-mail to Sills). In that e-mail, Mr. Fisher also reiterated his desire to have Mr. Levy serve on Kinesoft's Board:

* * *

We will certainly honor our funding obligations under the 1997 Agreement. We would not unreasonably withhold funding we had agreed to advance. However, this commitment was to achieve Kinesoft's Business Plan to become a leader in the interactive entertainment industry. The obligation is to fund . . . transactions reasonably calculated to achieve the goals in the Business Plan.

We are, of course, willing to review in good faith future requests for capital as contemplated by the Agreement. Nevertheless, we have reservations whether Kinesoft can realistically be a potential leader in the interactive entertainment industry. If not, any proposed transaction will [sic] fail the test of being reasonably calculated to achieve this goal. I thought you should know of our reservations now rather than later if we have to turn down requests for capital. I would also like to designate Jordan as Softbank's official Board member for Kinesoft. In this way we can be sure that we handle any requests that you have as expeditiously as possible.

You also apparently misunderstood Jordan's suggestion that you consider investing in the Internet. We are certainly not urging you to take one course or another. We both believe strongly in the potential for Internet ventures. Jordan was trying to be constructive in indicating what he would do with unused capital.

* * *

(*Id.*). Mr. Sills testified that, after he received the April 26, 1999 e-mail, he "believed that Jordan Levy was on the Board of Directors by virtue of the April 26, 1999 e-mail from Ronald Fisher, and began to treat him as such" (Pl.'s Add'l Facts ¶ 78; Pl.'s Ex. O, Sills Aff. ¶ 10).

## E.     The Digital Anvil Proposal.

On August 6, 1999, Mr. Sills and Mr. Spitzer flew to Buffalo, New York for a planned meeting with Mr. Levy (Answer ¶ 22; Pl.'s Add'l Facts ¶ 81-82). Mr. Levy knew that Messrs. Sills and Spitzer planned to ask for a Capital Advance (Pl.'s Add'l Facts ¶ 81; Pl.'s Ex. D, Sills Dep., at 504-06; Defs.' Reply Facts ¶ 81; Pl.'s Ex. K, Levy Dep., at 204-05), although he did not know in advance of the meeting the details of the proposed use of the funds (Pl.'s Add'l Facts ¶ 81).[6]

During the August 6 meeting, Mr. Sills and Mr. Spitzer presented to Mr. Levy a proposal to obtain a Capital Advance from Softbank to fund a joint business venture with Digital Anvil, an established company  (Pl.'s Add'l Facts ¶ 81). In exchange for $5 million capital to be supplied by Kinesoft, Digital Anvil offered Kinesoft the opportunity to gain early access to the "Playstation 2" development through Digital Anvil's connections with Sony (Pl.'s Add'l Facts ¶¶ 81-82; Defs.' Ex. 29, at S0012-S0015). According to the plan advanced by Mr. Sills and Mr. Spitzer at this meeting, Kinesoft sought to form a new company with Digital Anvil, to be called "NewCo," which would create games for Playstation 2 (Pl.'s Ex. U: 8/9/99 Levy e-mail to Fisher). The "talking document" that comprised the written Digital Anvil proposal made to Mr. Levy did not contain a "proposed funding date" (Defs.' Facts ¶ 33).[7]

---

[6]We note that the defendants deny that Ms. Levy believed that "Messrs. Sills and Spitzer were meeting with him to present a *Draw Request* to Softbank" (Defs.' Reply Facts ¶ 81). The Court, as will be apparent, has made a distinction between a "Draw Request" as defined under the 1997 Agreement, and a "Capital Advance." We believe that the deposition testimony of Mr. Sills and Mr. Levy establishes that Mr. Levy knew that Mr. Sills and Mr. Spitzer were coming to Buffalo to ask for a Capital Advance.

[7]The defendants assert that the Digital Anvil proposal also did not include the amount of the Capital Advance being sought. However, defendants' exhibits 30 and 31 (talking papers presented to Mr. Levy) provide numbers that add up to $5 million being sought, and Mr. Levy's subsequent e-mail to Mr. Fisher indicates his understanding that Kinesoft wanted $5 million from Softbank for the deal. We believe the documentary evidence together with Mr. Levy's e-mail is sufficient to take this fact beyond dispute (*i.e.*, the proposal did contain the amount of funding requested).

The parties agree that Kinesoft presented Mr. Levy with a binder of materials explaining the Digital Anvil proposal, and that Messrs. Levy, Sills and Spitzer discussed that proposal and the materials at length (Pl.'s Add'l Facts ¶ 82). However, the parties dispute whether the proposal made by Kinesoft at the August 6, 1999 meeting can be labeled a "Draw Request" under the terms of the 1997 Agreement (Defs.' Reply Facts ¶ 81). And, the parties dispute precisely what Mr. Levy said in response to Kinesoft's proposal during that meeting.

Kinesoft offers evidence (by the deposition testimony of Mr. Sills and Mr. Spitzer) that at the meeting, Mr. Levy stated as follows (Pl.'s Add'l Facts ¶ 82):

(a)     Kinesoft would have no further access to the funds for the Digital Anvil deal or any other deal or use. The nature of the use and/or deal was totally irrelevant.

(b)     Softbank had no further interest in Kinesoft or the business Kinesoft was in.

(c)     It was through no fault of Kinesoft, but Kinesoft no longer had the right partner -- Softbank had basically just changed its mind and was now focused solely and exclusively on the Internet.

(d)     Masayoshi Son had requested that Levy be a "prick" in dealing with Kinesoft and that he needed someone to be a "prick" with Kinesoft in order to get what he wanted.

(e)     The problem was not just Kinesoft, but that Softbank was moving quickly to divest itself of all of its non-Internet holdings because it was going to be a "pure" Internet company.

(f)     Softbank has turned an investment of tens of millions of dollars in Yahoo! into billions of dollars. This is what Softbank is interested in, not the business Kinesoft is in.

(g)     Softbank had rights under the Shareholders Agreement and would be exercising them. Softbank did not have to honor its commitments of funding since Kinesoft was not a leader in interactive entertainment, and Softbank had discretionary power over the spending of more than

> $500,000 by Kinesoft and would not approve any such expenditures going forward.

> (h)    If Peter Sills took $5 million out of the company and bought out Softbank's interest, he could do whatever he wanted with the company.

> (i)    If Peter Sills did not like it, what was he going to do, sue Softbank, a huge multinational concern? Softbank's power in the industry is great and it is much better to be its friend than its enemy. If Peter Sills elected to sue Softbank, he would have to do so with his own funds, . . . .

Softbank asserts that Mr. Levy merely informed Messrs. Sills and Spitzer that he did not think that Kinesoft's "potential transaction with Digital Anvil was advisable because he believed that Kinesoft ought to focus on its 'core business,'" and he did not believe that the Digital Anvil deal was "a good strategy for a small company with a limited number of key executives" (Defs.' Reply ¶ 82). Softbank denies most of the statements attributed to Mr. Levy at the meeting, and specifically denies that Mr. Levy said at this meeting that Softbank had no interest in Kinesoft; instead, Softbank asserts that Mr. Levy "merely observed that Softbank's business had 'shifted towards the Internet'" (Id.). Finally, Softbank concedes that Mr. Levy "suggested to Mr. Sills that, under the right circumstances, it might be sensible for Kinesoft to purchase Softbank's equity investment in Kinesoft," but denies that Mr. Levy told Mr. Sills that Kinesoft should buy out Softbank's interest for $5 million (Id.).

After his meeting with Messrs. Sills and Spitzer, Mr. Levy sent an e-mail to Mr. Fisher summarizing the Kinesoft proposal (Pl.'s Add'l Facts ¶ 83). The parties disagree as to whether Mr. Levy's August 9, 1999 e-mail forwarded to Mr. Fisher a "Draw Request" by Kinesoft for capital to fund the Digital Anvil venture (Defs.' Reply Facts ¶ 83). The August 9 e-mail states in relevant part:

> I met with Peter Sills and Ron Spitzer in Buffalo last Friday. They have been speaking with me over the last several weeks about [sic] [their] entry into the

Playstation 2 gaming business. They have a proposal to enter into a joint venture with Digital Anvil . . . to form a [n]ew company to produce a Playstation 2 game . . .

The deal would be a $5MM commitment as follows:

A.    [P]ay NewCo $250,000 for Playstation 2 sub-license[.]

B.    Loan NewCo $2.75MM, payback at end of 4 years[.]

C.    Kinesoft to invest a minimum of $2MM in development of [sic] [their] own Playstation 2 titles.

D.    Own 15% of equity in NewCo, with a call or put in one year for $1.25MM, which if called brings them down to 10% ownership.

1st titles would ship no sooner than Xmas 2001, yes 2001! The reason for Kinesoft interest is that Digital Anvil has access to all of the Sony technology but they cannot invest any Microsoft money in non-Windows development, so they need Kin[e]soft's $$. If Kinesoft starts Playstation 2 development today, they would not have a product to market until Xmas 2001 at best as well.

Rather than bore you with the details, here is what I said, as nicely as I could.

1.    I would pass the information on to you but that I would not recommend, support, encourage or anything even close to this the investment in the Playstation II platform.

2.    Until they demonstrate that they can build a title and bring it to market, a market that wants it, we are within our rights to withhold additional investment in anything other than our core strategy of PC based games. They are working on 2 games for Xmas 2000.

3.    *If they were smart, now would be a good time to try to "take" Softbank out and get control of [sic] [their] company.* I suggested to them that we would probably walk away under the right circumstances and give them the company.

4.    *I explained the changes in strategy since June 1995 and that this no longer fits within the Softbank business and that while you did want to be in this business in 1995 and had every intention of support, the world has changed but they have not.*

At the conclusion of the meeting, I layed out three alternatives for them to consider.

A.    Make us a proposal to buy us out of the deal.

B.    Continue along the PC game path and develop[] a great title or two.

C.    Build a strategy to be in the internet gaming business in a way that makes sense and we believe they can execute.

*I think that they left here clearly understanding that we would NOT allow them to invest in the Playstation II deal, but I am not sure they will give up.* They have already consulted lawyers with respect to the agreement and believe that we canno[]t stand in their way here. . . . [I] consul[t]ed them to not [t]ake the legal track, especially against Softbank. . . .

(Pl.'s Ex. U, S 0021) (italics added).

Softbank's 1999 Annual Report reflects this shift of focus in Softbank's business strategy described in Mr. Levy's e-mail. The Report states that Softbank had received the consent of its Board to become an "Internet-centric company" (Defs.' Reply Facts ¶ 73; Pl.'s Ex. R, at 2). Soon after the release of that annual report, Softbank divested holdings in Ziff-Davis and Kingston Technologies, two non-Internet related companies (Defs.' Reply Facts ¶ 74). Softbank admits that once this shift toward the Internet took place at Softbank, Kinesoft was outside of Softbank's "core focus" (Defs.' Reply Facts ¶¶ 75, 82 (Ex. K, Levy Dep., at 188)).

**F.    Kinesoft's Further Communications with Softbank Concerning the Digital Anvil Proposal.**

On August 31, 1999, Mr. Sills wrote to Mr. Levy regarding the Digital Anvil proposal (Pl.'s Add'l Facts ¶ 84; Defs.' Ex. 33). Mr. Sills' e-mail reflects Kinesoft's understanding that Softbank would not make a Capital Advance for that proposal, and instead requested that Softbank consider an alternative approach that would use Kinesoft rather than Softbank capital:

Given Soft[b]ank's denial of our request, I have been considering other ways in which we could still preserve the considerable value that this deal would bring to Kinesoft. *As a board member, I would like to know if you would support this deal if Kinesoft were to "self-fund" it with our existing capital?* If so, I would then need to present this opportunity to Peter Mason, our other board member, and secure his support prior to moving forward. At this point, I *would want to get your sign off, before making such a presentation.*

18

The time frame for this deal is short. If we do not move quickly, Digital Anvil will secure other partnerships, and we could very well be locked out of this opportunity.

*\*\**

(Defs.' Ex. 33:  08/31/99 Sills e-mail to Levy) (emphasis added).

Mr. Levy responded to Mr. Sills by e-mail dated September 7, 1999, stating:

> I will be with Ron Fisher tonight and ask him what he thinks.  I would need to know:
>
> > How much cash will it require?
> > What will that mean for the future of the business?
> > Will you need additional cash later from Softbank [?]
>
> Please answer these [questions] as soon as you can and I will let you know what I think tomorrow.

(Pl.'s Ex. W:  09/07/99 Levy e-mail to Sills).  On September 8, 1999, Mr. Sills answered Mr. Levy's

questions as follows:

> Sorry I was not able to get back to you quickly enough for your meeting.  However, the information has not substantially changed since we presented it to you last month in Buffalo.
>
> However, without Soft[b]ank's support for the draw request, there is an additional financial drain on the company.  Though this increases our risk, we feel that this is manageable.  The rewards[,] however, are early access to the Playstation 2 marketplace, which, as you know, is worth a great deal.
>
> You should have all of the information in the packet Ronald Spitzer and I left with you. . . . Time is very short, . . .

(Pl.'s Ex. W:  09/08/99 Sills e-mail to Levy).  After meeting with Mr. Fisher, Mr. Levy replied as

follows:

> Ron and I spoke about this last night and he is in agreement that the best thing for everyone is to make a deal to get you 100% of your company.  They/We have no appetite to do anything in this space and that will severely constrain you going forward.  *I once again make the following offer, give Softbank $ 5MM and relieve them of any further involvement and we will give you all of our stock in Kinesoft.*

Peter, I am sorry, but things have changed in the Softbank world and game development and software just do not fit into the business model. Add to it the current state of your business, and you just do not have the right partner any longer. We would be writing off $10MM plus whatever else you received, not pretty but the right thing for all involved. You should then look for a partner who will have interest in this business and you can make a good deal.

. . . In conclusion, *I will not support any investment in anything that you are not currently doing and until you have success, financial that is, we will be very tight with investment.*

(Pl.'s Ex. W: 09/08/99 Levy e-mail to Sills) (emphasis added). Although Mr. Fisher did not recall seeing Mr. Levy's September 8, 1999 e-mail to Mr. Sills (Pl.'s Add'l Facts ¶ 84; Pl.'s Ex. J, Fisher Dep., at 391-93), Mr. Fisher did not deny having a discussion with Mr. Levy regarding this matter (Pl.'s Ex. J., Fisher Dep., at 392). However, Mr. Levy's e-mail did not base Softbank's denial of a Capital Advance on the lack of a Draw Request that met all procedural requirements under the 1997 Agreement, and it did not indicate that a decision by Softbank on whether to approve Kinesoft's use of its own funds had to await a vote at a formal board meeting by Kinesoft.

In response to this denial of Kinesoft's proposal to use its own funds to pursue the Digital Anvil deal, Mr. Sills wrote a letter dated September 10, 1999 to Mr. Levy – and this time copied Mr. Fisher on it (Pl.'s Add'l Facts ¶ 85). That letter stated in relevant part:

. . . After reviewing [your] letter, and considering your comments in Buffalo last month, I find it extremely disheartening that Soft[b]ank has consciously opted not to honor its obligations. It is my goal to bring this matter to closure quickly so as to minimize any further damage to Kinesoft's ongoing business. I hope I can count on your assistance in these matters.

Let me recap a bit of our recent history. August 6th both Ronald Spitzer, president of Kinesoft Development, and I met with you regarding a Draw Request as outlined in our Agreement dated June 13, 1997. We brought with us more than sufficient documentation outlining the deal before us, which we were prepared to speak to.

This request, which is based upon a deal which has consumed much of our time over the last several months, is extremely beneficial to Kinesoft, and well within the parameters set forth under the terms of the Agreement. I do not believe, based upon our conversations, that any of this is in dispute.

In fact, in discussing the deal before us, you yourself stated that the deal was clear and represented a reasonable move into the console market (Playstation 2). Our partner in this deal, Digital Anvil, is also backed by Microsoft, and is well known in our industry as a significant "player" in the market.

However, we were not able to present these materials to you for discussion. The determination, according to your statements representing Soft[b]ank, was that the decision had already been made prior to our arrival in Buffalo. Soft[b]ank had no interest in living up to it[s] obligations and commitments, as such, no draw request would be honored. *The reasoning that had been calculated on your part to satisfy the contract was that Soft[b]ank was not obligated to honor any draw request until Soft[b]ank deemed Kinesoft a "success." While this in no way lives up to either the wording or intent of the Agreement, when pressed for a definition of the term "success" during our follow-up phone conversation, you informed me that no such definition would be forthcoming.*

Cutting to the chase, as you have outlined, in your e-mail of Sept. 8th, Soft[b]ank's business has changed. Due to their recent and phenomenal success in the Internet, they are moving quickly to divest themselves of any and all positions which are not Internet related. They are also taking a dim view of any business venture that is not living up to their current Internet returns. As you yourself stated, Soft[b]ank no longer has any interest in our business.

\* \* \*

Softbank . . . seems to be working under a misconception concerning our relationship. While Kinesoft is indeed minority owned by Soft[b]ank, the current issue before us is not one of asking for further investment. It is the fulfillment of Soft[b]ank's settlement obligations to Kinesoft and to myself. In 1997, I signed away significant rights based upon securing a[] Settlement Agreement with Soft[b]ank which I felt in the long run would be mutually beneficial to both parties. . . . As a result, Kinesoft released its claims and Soft[b]ank committed to make advances to Kinesoft, provided only that advances were made in the form of a Draw Request, "for purposes reasonably calculated to further Kinesoft's pursuit of becoming a leader in the interactive entertainment industry."

After reviewing Soft[b]ank's current, clearly stated position both with my executive staff, additional board members, and corporate counsel, I have come to the

conclusion that I must inform you that you are in breach of both our Settlement Agreement of June 1997 as well as the associated Release.

*** 

(Defs.' Ex. 35: 09/10/99 Sills Letter to Levy) (emphasis added).

The parties do not dispute that Kinesoft believed that Softbank was in breach of the 1997 Agreement and that this belief is reflected in Mr. Sills September 10, 1999 letter to Messrs. Levy and Fisher (Defs.' Facts ¶ 37). However, Softbank claims that in a letter some five weeks later, dated October 19, 1999, Mr. Fisher made clear that Softbank would honor the 1997 Agreement. The text of that letter is as follows:

Thank you for copying me on your September 10 letter to Jordan. There seems to be a misunderstanding about Softbank's position.

As I said in my April 26 e-mail, we will certainly honor our funding obligations under the 1997 Agreement. *But these arise only if a proposed capital expenditure is reasonably calculated to achieve the Business Plan to become a leader in the interactive entertainment industry. We do not believe your new foray into Playstation 2 has a reasonable chance of success.*

Given our reservations, we do not believe Softbank is obligated to rubber stamp your proposal. In signing the 1997 Agreement, Softbank did not give up its directors' rights. On the contrary, Section 2.01(e) specifically requires the approval of a Softbank representative for any Capital Advance. In addition, although the 1997 Agreement in effect superseded the Game Porting Agreement, it had no effect on the Shareholders Agreement which still controls corporate governance at Kinesoft. *Section 2 of the Shareholders Agreement requires Softbank's vote to authorize a change in the scope of business like the development of products for Playstation 2. In exercising that right, Softbank is not obligated to defer to you or the other Kinesoft staff or directors.*

I'm sorry you apparently misunderstood Jordan's explanation of Softbank's position. In candidly sharing with you our Internet strategy, he was not signaling that we would refuse to honor our obligations. We would never do that. The point is rather that we have serious reservations about Kinesoft's prospects pursuing new initiatives.

(Defs.' Ex. 36: 10/19/99 Fisher letter to Sills) (emphasis added). In that letter, Mr. Fisher did not base Softbank's denial of a Capital Advance on a failure by Kinesoft to comply with the procedural requirements for a Draw Request; nor did Mr. Fisher assert that it was premature for Kinesoft to conclude that Softbank would reject Kinesoft's use of its own money for the Digital Anvil project because the matter had not yet come up for a formal board vote.

Kinesoft was apparently not reassured by Mr. Fisher's letter, and on November 15, 1999, it commenced this lawsuit.

### G. Kinesoft's Economic Performance.

It is undisputed that Kinesoft has generated no profits from January 1, 1997 through the present (Defs.' Facts ¶ 19). Kinesoft has not released any PC game for consumer sale during that time and does not plan to release any game until sometime in 2001 (Defs.' Facts ¶ 18). Since January 1997, Kinesoft's business has been devoted entirely to its attempt to develop two games; to its unsuccessful effort to license two other games; and to the consideration of other games that it never developed (Defs.' Facts ¶ 18).

Moreover, the discovery record is clear that if and when Kinesoft releases PC games for consumer sale, there is no guarantee that those games will be profitable. Kinesoft acknowledges that the interactive entertainment industry is a "hit driven" business where the greatest profits are generated by only a few of the games released, and the revenues are earned by only a few game producers (Defs.' Facts ¶ 41; Defs.' Ex. 41, at S 0316 (Sills Report); Defs.' Ex. 42, at Schedules 4 and 9 (Bruehl Expert Report); Defs.' Ex. 44, at 224-25 (Willis Dep.)).

Mr. L. Gregory Ballard, one of Kinesoft's experts, states that "no company has yet discovered the 'magic formula' to absolutely guarantee that their titles are successful" (Defs.' Facts ¶ 41). Mr.

Ballard acknowledged that "many [game] titles are not successful" even for companies that have figured out a "formula" for creating successful titles (Defs.' Facts ¶ 42), and that it is difficult to predict whether a company will release a "hit" video game unless that company has a past performance of success (Defs.' Facts ¶ 45).

Mr. Anton Bruehl, another Kinesoft expert, has provided sales projections for the PC and console software and hardware market generally, and from those general projections has extrapolated general sales projections for the Playstation 2 and PC games markets (Defs.' Facts ¶ 46). However, in his deposition, Mr. Bruehl testified that "it might be difficult to forecast success or failure . . . [b]ecause of the changing nature of the industry, the fickle nature of consumers, and a lot of elements that could happen to any company. Nothing can be predicted with a great deal of certainty" (Pl.'s Ex. DD, Bruehl Dep., at 432). Mr. Bruehl states that average sales for a game could be analyzed for a company with prior success and many years of experience in the field, but testified he had not done such an analysis of Kinesoft (Defs.' Facts ¶ 46; Pl.'s Resp. Facts ¶ 42; Pl.'s Ex. DD, Bruehl Dep., at 437-38). According to Mr. Bruehl, unless a company has a record of releasing only "hit game titles, it would be unreasonable to predict that every game a company plans to release would be a commercial success (Defs.' Facts ¶ 52).

Finally, Mr. Chris Roberts, the Chief Executive Officer of Digital Anvil, testified regarding the industry and launch of the Playstation 2 platform. Mr. Roberts testified that only the top ten or twenty games (of the thousands produced and released each year) generate all of the industry's profits (Defs.' Ex. 25, Roberts Dep., at 93). Mr. Roberts indicated that some products, like Playstation 2, are more likely to succeed than other new products based on various factors, like the experience of those working on the game and the amount of capital available to develop it; but

Mr. Roberts did not state that the Playstation 2 and any games to be used on that system were a "sure bet" (Pl.'s Ex. S, Roberts Dep., at 104-05). Mr. Roberts said he could "hazard a guess" as to the potential success of the Playstation 2 market; and that he had "a pretty strong gut feel that Playstation 2 is going to be a very lucrative business" (Defs.' Facts ¶ 44; Defs.'s Ex. 25, Roberts Dep., at 53). Mr. Ballard, however, said it was not possible to generalize whether a particular game title for Playstation 2 would be successful "without knowing more about that title" (Defs.' Facts ¶ 44). Consistent with this opinion, Mr. Roberts testified that no one could project how a new game would sell in the market, and that such projections were speculation and conjecture (Defs.' Facts ¶ 43; Defs.' Ex. 25, Roberts Dep., at 79-80).

The report of Kinesoft's expert Stephen I. Willis opines that "Kinesoft's actions lead to a reasonable expectation of success" (Defs.' Ex. 12, at 17). Mr. Willis makes several future lost profits projections, which total nearly $80 million before reduction to present value (Final Pretrial Order, § VII). *First,* Mr. Willis projects that Kinesoft will lose $3.67 million in future profits from two PC games on which Kinesoft is working but is months away from fully developing or releasing (Defs.' Ex. 12, at 17). *Second,* Mr. Willis projects that Kinesoft will lose some $7 million in future profits from the sale of three PC games that Kinesoft has considered but has never started to develop (*Id.*). *Third,* Mr. Willis projects that Kinesoft will lose an additional $18.39 million in future profits from the sale of three unspecified Playstation 2 games that Kinesoft has never identified or started to develop. Finally, Mr. Willis projects that Kinesoft will lose another $50.36 million attributable to "economic harm from [the] continuing effect on Kinesoft's lower earnings" (*Id.*).

Mr. Willis admits that his lost profits projections are not based on *actual* lost profits but instead are based on lost profits that Kinesoft might have earned in the *future*. Although Mr. Willis

admits that "relatively few titles . . . are commercially and financially successful," his future lost profits claim assumes that, on average, Kinesoft's titles would succeed commercially and financially at a "B+" rate (Defs.' Facts ¶ 51; Defs.' Ex. 12, at 18; Pl.'s Resp. Facts ¶ 51; Pl.'s Add'l Facts ¶ 87). Mr. Willis admits that he did not examine Kinesoft's profit history in order to calculate Kinesoft's lost profits, because Kinesoft has none in this line of business (Defs.' Ex. 44, Willis Rep., at 251). Mr. Willis' report utilizes Mr. Bruehl's general industry information, but "his lost profits projections are not based on any analysis of a comparable company selling comparable games" (Defs.' Facts ¶ 53; Pl.'s Resp. Facts ¶ 53).

### III.

Against the backdrop of this evidentiary record, we consider Softbank's request for summary judgment. For the reasons explained below, the Court denies Softbank's motion for summary judgment on Counts I, II, IV and V, as well as the compensatory and punitive damages claims, but grants the motion as to Count III and the lost profits claims.

### IV.

In Count I, Kinesoft alleges that Softbank breached the 1997 Agreement. Kinesoft offers two theories to support this claim: (1) a "non-performance" theory (that Softbank breached the contract by improperly rejecting Kinesoft's request for a Capital Advance the Digital Anvil venture) (Second Am. Compl. ¶ 29); and (2) a "repudiation theory" (that Softbank, by its words and conduct, utterly renounced any intention of ever honoring any requests by Kinesoft for a Capital Advance) (*Id.* ¶¶ 30-32). Softbank denies that it breached the 1997 Agreement. Softbank claims that its obligations under the 1997 Agreement were never triggered, because Kinesoft failed to present a Draw Request for the Digital Anvil proposal in accordance with the agreed-upon procedures necessary to obtain

a Capital Advance, thereby failing to satisfy a condition precedent (Defs.' Mem. at 4; Defs.' Reply at 1). Softbank also denies that it repudiated the 1997 Agreement, on the ground that Softbank never made any "unequivocal statements" of repudiation (Defs.' Mem. at 6; Defs.' Reply at 5-6).

The parties agree that Illinois law governs the determination of this claim, pursuant to the choice of law provision in the 1997 Agreement (Ans. ¶ 2; Pl.'s Add'l Facts ¶ 62; 1997 Agreement §§ 5.05-5.06). Thus, we address under Illinois law first the non-performance theory, and then the repudiation theory.

## A.

Softbank argues that because Kinesoft failed to submit a procedurally correct Draw Request, there could be no breach because Softbank had no contractual obligation to perform. This "conditions precedent" argument is an affirmative defense for which Softbank bears the burden of proof. *See Capitol Plumbing & Heating v. Van's Plumbing,* 58 Ill. App. 3d 173, 175 (4th Dist. 1978). In assessing Softbank's argument, we consider in turn (1) whether Sections 2.01 (d) and (e) constitute conditions precedent; (2) if so, what requirements do those sections impose, and have they been met; and (3) if they have not been met, are they excused by Softbank's conduct.

## 1.

"Illinois courts define a condition precedent as one which must be performed either before a contract becomes effective or which is to be performed by one party to an existing contract before the other party is obligated to perform." *MXL Industries, Inc. v. Mulder,* 252 Ill. App.3d 18, 25 (2d Dist. 1993). "The satisfaction of a condition [precedent] is generally subject to the rule of strict compliance." *Id.*

The determination of whether an agreement contains a condition precedent is a question of law for the court. "A court determines whether an agreement makes an event a condition by the process of interpretation." *See* E. ALLEN FARNSWORTH, FARNSWORTH ON CONTRACTS ("FARNSWORTH ON CONTRACTS"), § 8.2, at 394 (2d ed. 1998). In Illinois, the process of interpreting contractual language is, at the threshold, a matter for the court alone. A court "must initially determine, as a question of law, whether the language of a purported contract is ambiguous as to the parties' intent." *Quake Construction, Inc. v. American Airlines, Inc.,* 141 Ill.2d 281, 288 (Ill. 1990). "If no ambiguity exists in the writing, the parties' intent must be derived . . . as a matter of law, solely from the writing itself." *Id.* at 288. *See also Air Safety, Inc. v. Teachers Realty Corp.,* 185 Ill.2d 457, 462-63 (Ill. 1999) (rejecting application of "extrinsic ambiguity" doctrine in contracts with integration clauses, applying "four corners rule" and stating that agreement "speaks for itself"; is "not to be changed by extrinsic evidence"; and court "initially looks to language of contract alone").[8]

Having reviewed the 1997 Agreement, the Court finds that the language of Sections 2.01(d) and (e) reflects no ambiguity regarding the parties' intent: those sections contain express conditions precedent to Kinesoft obtaining a Capital Advance. "Conditions that are agreed to by the parties .

---

[8]Given the Illinois Supreme Court's recent reaffirmation of the four corners rule and its outright rejection of the doctrine of extrinsic ambiguity in the interpretation of contracts with complete integration clauses, such as the integration clause in the contract in this case (*see* 1997 Agreement, § 5.02), earlier Seventh Circuit decisions that express a different view of Illinois law than *Air Safety* – such as, *AM International, Inc. v. Graphic Management Assocs., Inc.,* 44 F.3d 572, 574-75 (7th Cir. 1995) (rejecting four corners rule as unsound and contrary to the well-established principle of "extrinsic ambiguity"); *Home Ins. Co. v. Chicago and Northwestern Transp. Co.,* 56 F.3d 763,767-78 (7th Cir. 1995) (collecting cases and stating that Illinois had largely rejected the four corners rule and had embraced some form of the extrinsic ambiguity doctrine) – do not control. We note, however, statements by the commentators indicating that the four corners rule is the older, more restrictive view, but the modern trend adopts the more liberal view articulated by the Seventh Circuit in the cases cited above. *See, e.g.,* FARNSWORTH ON CONTRACTS, § 7.12, at 297-300. We also note that, by its terms, the holding in *Air Safety* does not apply to cases where complete integration clauses are not used.

. . are . . . express conditions." FARNSWORTH ON CONTRACTS, § 8.2, at 394. Express conditions are those that are written down in specific words. CATHERINE M.A. MCCAULIFF, CORBIN ON CONTRACTS, § 30.10, at 19 (Rev. ed. 1999) (conditions made by agreement of the parties are expressed in definite language when the contract is made and are called an "express" condition); FARNSWORTH ON CONTRACTS, § 8.2, at 394 (conditions agreed to by the parties are referred to as "express conditions"). Express conditions are intended to make an event a condition to an obligation and can be recognized by use of terms such as "if," "on condition that," "provided that," "in the event that," and "subject to," but other words may suffice. FARNSWORTH ON CONTRACTS, § 8.2, at 394.

That is precisely the kind of language that the 1997 Agreement uses in describing Capital Advances. For example, Section 2.01(d) of the 1997 Agreement states that: "Softbank's obligation to make Capital Advances is *subject to* the satisfaction of the *conditions* set forth in <u>subsection (e)</u> . . . ." (emphasis added). Section 2.01(e) then describes the requirements by which requests for Capital Advances "shall be governed." Section 2.01(e)(ii), to which the subsection (d) refers, then lists the procedures that "shall" be followed when Kinesoft makes a "Draw Request" for a Capital Advance, such as: a "written request" submitted to Softbank in (accordance with Section 5.04) which sets forth the "amount of the requested advance" (§ 2.01(e)(ii)(A)); "a description of the proposed use of the proceeds of such Advance . . ." (§ 2.01(e)(ii)(B)); and "the proposed funding date" (§ 2.01(e)(ii)(C)).

Read together, those terms unambiguously express the parties' intent to make the procedures outlined in Section 2.01 (e)(ii) conditions precedent to Softbank's obligation to make a Capital Advance. The issue of interpretation in this case is therefore not whether the language of the

contract reflects the parties' intent to create conditions precedent or to require that those conditions be fully satisfied prior to the actual distribution of a Capital Advance: that language is unambiguous. The particular question that has arisen here is whether the language of the contract requires those same conditions to be fully satisfied not only before a Capital Advance is paid, but also before it is even considered. The absence of clear language governing this precise question creates an ambiguity.

Where an ambiguity is present in a contract, Illinois permits courts to admit "parol evidence" to "aid the trier of fact in resolving the ambiguity." *Air Safety,* 185 Ill.2d at 462-63 (citing *Farm Credit Bank v. Whitlock,* 144 Ill.2d 440, 447 (Ill. 1991)); *see also Quake,* 141 Ill.2d at 288. Here, the evidence Kinesoft asks us to consider is course of performance evidence.[9]

It is clear that under Illinois law the parties' course of performance is admissible to help to resolve the ambiguity identified in the 1997 Agreement. *See, e.g., Barney v. Unity Paving, Inc.,* 266 Ill. App.3d 13, 18 (1st Dist. 1994) ("It is a firmly established principle of contract interpretation that courts should give great weight to the parties' interpretation of the contract because the parties are in the best position to know what was intended by the language employed"); *Chicago and Northwestern Railway Co. v. Peoria and Pekin Union Railway Co.,* 46 Ill. App.3d 95, 100-01 (3d Dist. 1977) (in case of ambiguity, court relied on parties' course of performance as evidence of their "settled construction" and relying on Restatement (Second) of Contracts § 228(4), held that "[t]he parties to an agreement are in the best position to know what they meant, and their action under the

---

[9]"Course of performance" evidence reflects the parties' interpretation of the contractual terms and thus their intent regarding the meaning of those terms. FARNSWORTH ON CONTRACTS § 7.13, at 318 n.30. Although extrinsic to the contract, course of performance is not technically "parol" evidence, because it identifies the parties' post-agreement conduct rather than their actions prior or contemporaneous to contract formation. FARNSWORTH ON CONTRACTS § 7.3, at 228.

contract is often the strongest evidence of their intended meaning"); *New York Central Dev. Corp. v. Byczynski,* 95 Ill. App.2d 474, 477 (3d Dist. 1968) (in addition to parol evidence, courts can admit evidence of parties' acts or course of performance to interpret what parties intended as to silent, but essential matters, in the contract). *See generally St. Joseph Data Service, Inc. v. Thomas Jefferson Life Ins. Co. of America,* 73 Ill. App.3d 935, 940 (4th Dist. 1979) (suggesting that where there is ambiguity, the court may admit parol evidence or evidence of the parties' course of performance). Indeed, it stands to reason that course of performance may be used to interpret the intent of the parties, since such evidence likely reflects the parties' understanding of their agreement. FARNSWORTH ON CONTRACTS § 7.13, at 318 n.30 (quoting an English judge who once said: "show me what the parties did under the contract and I will show you what the contract means").

The next question is whether the Court may consider extrinsic evidence in resolving the ambiguity on a motion for summary judgment. In general, Illinois gives questions of contractual ambiguity to the trier of fact, together with the evidence necessary to resolve them. *See generally Air Safety,* 185 Ill.2d at 462-63; *Whitlock,* 144 Ill.2d at 447; *Quake,* 141 Ill.2d at 288-89. However, there is an exception to this general rule: "Under Illinois law, if a contract is ambiguous, its interpretation is a question of law for the court as long as the extrinsic evidence bearing on the interpretation is undisputed." *Baker v. America's Mortgage Servicing, Inc.,* 58 F.3d 321, 326 (7th Cir. 1995) (citing *Nerone v. Boehler,* 34 Ill. App.3d 888, 890-91 (5th Dist. 1976); *Ridenhour v. Mollman Publishing Co.,* 66 Ill. App.3d 1049, 1051 (1978)). *See also Sherbrooke Homes, Ltd. v. Krawczyk,* 82 Ill. App.3d 990, 992 (1st Dist. 1980) (general rule is that interpretation, construction or legal effect of contract is matter of law for courts "when there is no question involving proof of the parties' construction which is dependent upon disputed extrinsic facts").

Having found an ambiguity in the 1997 Agreement regarding whether the parties intended for all conditions precedent to be fully satisfied not only before a Capital Advance was issued, but also before a request for one would even be considered, the Court also finds that this ambiguity can be answered by resort to undisputed extrinsic evidence of the parties' course of performance. Under the rule articulated in *Baker*, we therefore treat this question of ambiguity, and its resolution, as a matter of law.

The parties' course of performance during the prior three Capital Advance requests satisfies the Court that the parties intended for the conditions precedent to be satisfied before a Capital Advance was made, but not before one was considered. In each prior Capital Advance request, all information required by Section 2.01(e)(ii) was conveyed to Mr. Fisher before a Capital Advance was provided under Section 2.01(e)(ii)(iii). However, the same course of performance evidence reveals that Softbank never required Kinesoft to satisfy all the procedural requisites of a Draw Request as a precondition to considering a proposal by Kinesoft for a Capital Advance. In none of the three prior requests for Capital Advances that preceded the Digital Anvil proposal did Kinesoft come out of the box with a procedurally correct Draw Request; and in none of these instances did Softbank reject the request, or refuse to even consider it, on that basis. That conduct is consistent with the fact that Section 2.01(e)(iv) does not prohibit Kinesoft from amending or supplementing a Draw Request to provide information necessary to obtain ultimate approval of a Capital Advance. And, the parties' conduct reflects that they routinely engaged in an interactive process whereby Kinesoft's initial requests would be supplemented until all information required for a Draw Request was supplied in writing to Mr. Fisher.

Accordingly, the Court concludes as a matter of law that Section 2.01(e)(ii) imposes certain procedural requirements as a conditional precedent to the *granting* by Softbank of a request for Capital Advance. However, the Court further concludes as a matter of law that compliance with those procedures is not a condition precedent to Softbank *considering* a request for Capital Advance.

## 2.

Kinesoft claims that if Section 2.01(e)(ii) imposes procedural conditions precedent, then those conditions have been modified or waived by Softbank's course of performance. Under Illinois law, a party may or modify or waive a condition precedent. *See, e.g., MXL*, 252 Ill. App. 3d at 26 (although conditions precedent are generally subject to the rule of strict compliance, these conditions can be excused by modification of the parties, or they can be waived by course of performance); *see also Community Convalescent Center v. First Interstate Mortgage Co.*, 181 Ill. App. 3d 996, 1000 (2nd Dist. 1989) (a party seeking the benefit of a condition precedent may waive strict compliance by conduct indicating that strict compliance with the provision will not be required); *see generally Normand v. Orkin Exterminating Co., Inc.*, 193 F.3d 908, 912 (7th Cir. 1999) (indicating in dicta that a contract can be modified by course of performance where there is no contractual limitation on such modification); *Pitt-Des Moines, Inc. v. Metropolitan Pier & Expo. Auth.*, No. 96 C 2873, 1999 WL 14491, * 4 (N.D. Ill. 1999) (conditions in contracts can be modified by subsequent conduct of parties even where contract is unambiguous on its face).

Kinesoft's claim of modification runs headlong into Section 5.01 of the 1997 Agreement, which specifically requires that all "modifications of the terms or provisions" in the Agreement "be in writing and duly executed by the parties." Section 2.01(e)(ii) states that "Kinesoft shall request a Capital Advance by submitting to Softbank a written request . . . in accordance with Section 5.04"

(a "Draw Request"). Under Section 5.04, written notices must be directed to Mr. Fisher. Kinesoft essentially argues (although not in so many words) that the April 26, 1999 e-mail from Mr. Fisher to Mr. Sills modified Section 5.04 of the 1997 Agreement, by designating Mr. Levy to replace Mr. Fisher as the person to whom all communications were to be sent. The e-mail, although arguably a writing, was not a modification executed by *both* parties, and so it was not effective under Section 5.01 to modify the 1997 Agreement.

Kinesoft also argues more broadly that the parties' course of performance establishes a modification of the conditions precedent. That argument stretches the use of course of performance beyond the breaking point. Course of performance may be used only to interpret the terms of an agreement; but, here Kinesoft seeks to use it to create terms inconsistent with the language of Sections 2.01(e) and 5.01. In Illinois, extrinsic evidence is not admissible to contradicts or vary with the written terms of a final agreement. *See Air Safety,* 185 Ill. 2d at 462 (reciting with approval traditional contract principles that do not permit extrinsic evidence to "change" the language used in the agreement); *Weiland Tool & Mfg. Co. v. Whitney,* 44 Ill. 2d 105, 114 (Ill. 1970) (extrinsic evidence may be introduced to "expand or interpret the document" if the language is ambiguous or uncertain). Thus, Kinesoft's modification argument fails.

Although not foreclosed by Section 5.01, Kinesoft's waiver argument does not advance its cause very far. The determination as to what facts are sufficient to constitute waiver is a question of law. *Whalen v. K-Mart Corp.,* 166 Ill. App. 3d 339, 343 (1st Dist. 1988). Waiver is an express or implied voluntary and intentional relinquishment of a known and existing right. *Id.* An implied waiver of a legal right may arise when conduct of the person against whom waiver is asserted is inconsistent with any intention other than to waive that right. An analysis of whether there was in

fact a waiver of contractual provisions focuses on the intent of the non-breaching party. If that party has intentionally relinquished a known right, either expressly or by conduct inconsistent with an intent to enforce that right, then the right has been waived. *Whalen*, 166 Ill. App. 3d at 343.

Whether viewed as an interpretation of Section 2.01(e), as aided by the course of performance (as the Court has held), or a matter of waiver (which is an alternative basis for the holding), the Court agrees that Kinesoft was not required to submit a Draw Request in order for Softbank to consider a Capital Advance request. *See generally* FARNSWORTH ON CONTRACTS, § 7.13, at 319 ("It is sometimes difficult to draw the line between conduct that is the basis for a course of performance, on the one hand, and conduct that is the basis for waiver or modification, on the other."). But Kinesoft's claim of waiver nonetheless falls short because, while Softbank did not require compliance with the Section 2.01(e) conditions in a single writing or on a designated time-frame, the course of performance evidence establishes that Softbank never waived Kinesoft's obligation to provide all the information in Section 2.01(e)(ii)(A)-(C) to Mr. Fisher prior to Softbank granting a Capital Advance. The 1997 Agreement requires that Kinesoft submit the required information to Mr. Fisher before Softbank is obligated to grant a request, a requirement that has not been waived and that Softbank claims stands as an impediment to Kinesoft's non-performance claim.

**3.**

However, even if not waived, an express condition may be excused. *MXL*, 252 Ill. App. 3d at 26. Thus, we consider whether the requirement of a Draw Request was excused here. Excuse of a condition precedent by breach occurs when the obligor commits "a breach that causes the nonoccurrence of the condition." FARNSWORTH ON CONTRACTS, § 8.6, at 431. "When the condition is excused, the obligor's duty becomes absolute." *Id.* One rationale for this result is that the obligor

is "liable for breach of an ancillary duty not to cause the nonoccurrence of the condition." *Id.* at n.1. *See also E.B. Harper & Co., Inc. v. Nortek, Inc.,* 104 F.3d 913, 919 (7th Cir. 1997) (a party cannot rely on failure of condition precedent if it is responsible for hindering occurrence of conditions through uncooperative conduct). "Another [rationale] is that the condition has been excused and the obligor is liable for breach of the main duty that then became unconditional." FARNSWORTH ON CONTRACTS, § 8.6, at 431 n.1. There appears to be "no practical difference between these rationales." *See* FARNSWORTH ON CONTRACTS, § 8.6, at 431 n.1 (citing *St. Louis Beef Co. v. Maryland Cas. Co.,* 201 U.S. 173 (1906) (Holmes, J.)).

Excuse by breach "may take the form of nonperformance, either by prevention or by failure to cooperate, or it may take the form of repudiation. The duty of good faith and fair dealing that is usually imposed requires at least that a party do nothing to prevent the occurrence of a condition of that party's duty." FARNSWORTH ON CONTRACTS, § 8.6, at 431 and n.3 (citing *Harold Wright Co. v. E.I. Dupont de Nemours & Co.,* 49 F.3d 308, 309 (7th Cir. 1995)). Under Illinois law every contract implies good faith and fair dealing between the parties to it. *Martindell v. Lake Shore Nat'l Bank,* 15 Ill. 2d 272, 286 (Ill.1958). The covenant of good faith and fair dealing is not an independent source of a cause of action under Illinois law. *See Beraha v. Baxter Health Care Corp.,* 956 F.2d 1436, 1443 (7th Cir.1992); *Wolf v. Federal Rep. of Germany,* No. 93 C 7499, 1995 WL 263471, *7 (N.D. Ill. 1995); *Industrial Specialty Chemicals, Inc. v. Cummins Engine Co., Inc.,* 902 F. Supp. 805, 811 (N.D. Ill.1995). Rather, breach of the duty of good faith and fair dealing is simply a breach of the underlying contract. *Industrial Specialty,* 902 F. Supp. at 811; *Unit Trainship, Inc. v. Soo Line R.R. Co.,* 905 F.2d 160, 163 (7th Cir. 1990); *Raprager v. Allstate Ins. Co.,* 183 Ill. App. 3d 847, 861 (2d Dist. 1989).

The covenant of good faith and fair dealing is thus a derivative principle of contract law that usually aids in the construction of a contract. *Perez v. Citicorp Mortgage, Inc.,* 301 Ill. App. 3d 413, 423-24 (1st Dist. 1998). This covenant comes into play where one party to the contract is given broad discretion in performance. *Id.* at 423-24. The party holding this broad discretion is required to exercise its discretion "'reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.'" *Id.* at 424 (quoting *Resolution Trust Corp. v. Holtzman*, 248 Ill. App. 3d 105, 112 (1st Dist. 1993)). "In examining cases to determine whether a party has breached the covenant of good faith and fair dealing, courts may consider the entire course of dealings between the parties." *Darovec Marketing Group, Inc. v. Bio-Genics, Inc.,* 114 F. Supp.2d 752, 762 (N.D. Ill. 2000). "Courts will not, however, interpret the covenant to make a better contract for the parties than they made for themselves, nor will courts construe the covenant to establish new, independent rights or duties not agreed upon by the parties." *Id.*

On the summary judgment record submitted, the Court finds that there are genuine fact disputes regarding whether Softbank fulfilled its obligations of good faith and fair dealing. Those disputes are better understood in light of what is undisputed, so we begin there. It is undisputed that on August 6, 1999, Messrs. Sills and Spitzer made a proposal to Mr. Levy requesting a Capital Advance from Softbank for a joint venture between Kinesoft and Digital Anvil (Pl.'s Add'l Facts ¶ 82). It is also undisputed that Mr. Levy conveyed the substance of this meeting and Kinesoft's proposal to Mr. Fisher in an e-mail three days later (Pl.'s Ex. U). In that e-mail, Mr. Levy conveyed the amount of funding requested, $5 million – arguably satisfying Section 2.01(e)(ii)(A) – and the proposed use of the proceeds – arguably satisfying Section 2.01(e)(ii)(B). There is no proposed

funding date, as required by Section 2.01(e)(ii)(C). Finally, there can be no dispute that Softbank, in a series of written e-mails and letters from Mr. Levy and Mr. Fisher to Mr. Sills, flatly denied Kinesoft's proposal for a Capital Advance to fund the Digital Anvil deal (Pl.'s Ex. W, at KS 0022; Defs.' Ex. 36). The stated reason for the denial was not that the proposal failed to meet the procedural requirements for a Draw Request, but rather for the substantive reason that Softbank did not deem the proposal "reasonably calculated to achieve the [Kinesoft] Business Plan to become a leader in the interactive entertainment industry" (Defs.' Ex. 36).

The disputed facts regarding breach of the duty of good faith and fair dealing deal largely with questions of what inferences to draw from these facts. Kinesoft argues that the 1997 Agreement contains an implied duty of good faith and fair dealing that required Softbank to "to do nothing to injure" Kinesoft's "right to enjoy the benefits of the contract" by hindering the occurrence of the condition through "uncooperative conduct" (Pl.'s Mem. at 5-6). Kinesoft argues that by denying the Digital Anvil request on the merits rather than for procedural reasons, Softbank dissuaded Kinesoft from making a Draw Request that conformed with the procedural requirements. Softbank argues that nothing prevented Kinesoft from making a conforming request, but a jury could reasonably find that argument disingenuous. A jury might reasonably decide that had Softbank indicated that its denial was based on procedural deficiencies, then Kinesoft would have gladly (and quickly) rectified the situation. But Softbank did not rely on procedural deficiencies; it rejected Kinesoft's proposal on the merits, by stating that the Digital Anvil proposal did not fit within Softbank's interpretation of the term "Business Plan" in the 1997 Agreement.

The e-mails and other letters authored by Mr. Levy and Mr. Fisher could lead a reasonable jury to conclude that Softbank had no intention of approving Kinesoft's request for a Capital

Advance, even if Kinesoft had strictly conformed to the procedural requirements set out in Sections 2.01(e)(ii)(A)-(C) for making a Draw Request. A jury reasonably could find that once Softbank (through Messrs. Levy and Fisher) said it would not approve the Digital Anvil proposal on the merits, there was no reason for Kinesoft to go through the futile exercise of revising the request procedurally. If the jury so finds, then Kinesoft's failure to submit a conforming Draw Request could not be used by Softbank to defeat the contract claim in Count I. *Yale Development Co., Inc. v. Oak Park Trust & Savings Bank*, 26 Ill. App. 3d 1015, 1020 (2d Dist. 1975) (a party cannot take advantage of its own conduct and claim that failure of the fulfillment of a condition therefore defeats its liability); *E.B. Harper*, 104 F.3d at 919 (citing *Unit Trainship, Inc. v. Soo Line R.R.*, 905 F.2d at 162-63); *Case v. Forloine*, 266 Ill. App. 3d 120, 125 (1st Dist. 1993) (duty of good faith and fair dealing "requires that parties use reasonable efforts to bring about the occurrence of conditions precedent within their control;" and party to whom condition owed cannot claim failure of the condition if that party is responsible for hindering the occurrence of the condition through "uncooperative conduct").

Even if the requirement of a Draw Request were excused, that would not automatically spell victory for Kinesoft. Rather, it would lead to consideration of the fundamental issue raised by Kinesoft in Count I: whether Softbank had the right to reject Kinesoft's request for a Capital Advance to fund the Digital Anvil deal based on its view that this deal did not fit within the "Business Plan" outlined in § 2.01(e)(i) of the 1997 Agreement. To prevail on Count I, Kinesoft still would have to prove that it was a breach for Softbank to say that, on the merits, the Digital Anvil proposal did not qualify for a Capital Advance. Softbank has not sought summary judgment on that theory, and from our review of the record, with good reason. There appear to be genuine disputes

regarding the parties' intent regarding what the "goals" of the Business Plan were; the types of transactions the parties intended would qualify for a Capital Advance; whether Kinesoft's proposal fell within the parameters of the "Business Plan"; and whether Softbank's position was unreasonable under Section 2.01(e)(iii).[10]

On these questions, the trier of fact may consider the entire course of dealing (pre-settlement conduct) and course of performance (post-settlement conduct) to determine the parties' true intent as to the agreement's terms. *See Quake Construction Co.*, 141 Ill. 2d at 288 (construction of ambiguous contract); *Darovec*, 114 F. Supp.2d at 762 (good faith and fair dealing). Thus, it will be the jury at trial, and not this Court on summary judgment, that must decide whether Kinesoft's submission of a fully complying Draw Request was excused by Softbank's conduct, and if so, whether Softbank's refusal to fund the Digital Anvil deal breached the 1997 Agreement.

## B.

Kinesoft urges another theory in support of its breach of contract claim against Softbank in Count I: repudiation (Second Am. Compl. ¶¶ 24-25, 30-32). While Kinesoft's complaint (Second Am. Compl. ¶¶ 30) and the Final Pretrial Order (Final Pretrial Order, § II(c)) could be construed as asserting that Mr. Fisher's October 19, 1999 letter constituted repudiation, in the briefing on summary judgment Kinesoft has squarely abandoned any such assertion (Pl.'s Mem. at 8) ("Kinesoft never alleged that Fisher's statements amounted to a repudiation"). Kinesoft now plainly asserts that the act(s) of repudiation were the comments allegedly made by Mr. Levy at the August 6, 1999

---

[10]Kinesoft asserts that the standard that Softbank should have applied in deciding whether to approve a Capital Advance "is so porous that anything short of buying a company catamaran or hiring a full-time aroma-therapist would surely filter through" (Pl.'s Mem. 3). It will be for the jury to decide whether that interpretation fairly reflects the mutual intent of the parties when they entered into the 1997 agreement.

meeting (*id.*), and Softbank's non-performance: that is, its refusal to fund the Digital Anvil proposal.[11]

Repudiation of a contract "usually . . . consists of a statement that the repudiating party cannot or will not perform." FARNSWORTH ON CONTRACTS, § 8.21, at 535. "A repudiation may be by words or other conduct." *Id.* And, although a party may state that it intends to honor its obligations, it may still repudiate the contract by insisting that it is obligated to perform only according to its own incorrect interpretation of the contract's terms. *Id.* at 536-37; *see also In Re Marriage of Olsen*, 124 Ill.2d 19, 24 (1988). Moreover, the refusal to perform may itself be a repudiation, in spite of a party's words seeking to reassure the other party of its intent to perform in the future. FARNSWORTH ON CONTRACTS, § 8.21, at 539-40.

In Illinois, "anticipatory repudiation is actionable as a breach of contract when – and only when – the repudiating party unequivocally and without justification renounces its duty to perform

---

[11]Although Kinesoft pled "anticipatory repudiation," Kinesoft says the evidence also shows that "Softbank failed to perform under the Settlement Agreement and repudiated the contract immediately thereafter" (Pl.'s Mem. at 8, n.4, citing Pl.'s Add'l Facts ¶¶ 81-84). The Final Pretrial Order sets forth this revised repudiation theory (*see* Final Pretrial Order § II(C), at 3), which controls even if this theory was missing from the complaint. *See, e.g., Hollymatic Corp. v. Daniels Food Equip., Inc*, ____ F. Supp. 2d ___, No 97 C 5014, 2001 WL 76410, * 1 (N.D. Ill. Jan. 26, 2001). Thus, we find that Kinesoft now alleges both anticipatory repudiation, defined under the Restatement (Second) of Contracts § 253(1) as repudiation before any act of performance or non-performance by the allegedly breaching party, and repudiation plus non-performance, as described in the Restatement (Second) of Contracts § 243(2).

Softbank argues that "Kinesoft's admission that it has fully performed under the June 1997 Agreement mandates dismissal of the anticipatory repudiation claim," because "'the doctrine of anticipatory repudiation is inapplicable where the plaintiff has completely performed and the defendant has not'" (Defs.' Reply at 6, citing and quoting *Kozasa v. Guardian Electric Manufacturing Co.*, 99 Ill. App. 3d 669, 674 (1st Dist. 1981)). We think Softbank overstates the effect of this "admission." Kinesoft does state in its opposition memorandum that it "performed its obligations under the Settlement Agreement" (Pl.'s Opp. Mem. 23); but, it is certainly arguable whether Kinesoft's "Release" (which is the performance referred to at page 23) is "all of the agreed exchange" for Softbank's obligations under the Settlement Agreement. *See* RESTATEMENT (SECOND) OF CONTRACTS § 253(1). Softbank certainly argues that Kinesoft had other performance obligations, such as the satisfaction of the conditions precedent. Given the factual and legal questions on the issue of repudiation and non-performance, together with Kinesoft's silence as to whether it has now abandoned its anticipatory repudiation claims (Pl.'s Opp. Mem. 8 n.4), the Court will not find at this point that Kinesoft cannot make out a claim for anticipatory repudiation.

the contract on its date of performance." *Draper v. Frontier Ins. Co.*, 265 Ill. App. 3d 739, 745 (2d Dist. 1994) (*citing Marriage of Olsen*, 124 Ill.2d at 24; *Lake Shore & Michigan Southern Ry. Co. v. Richards*, 152 Ill. 59, 89-90 (1894); *Wilmette Partners v. Hamel*, 230 Ill. App. 3d 248, 260 (1st Dist. 1992)). "There is no anticipatory repudiation if a party does no more than make doubtful or indefinite statements that it will not perform." *Id.*

There are several responses an injured party may make when the alleged repudiation comes before the time for performance. *First,* the injured party may treat the contract as terminated and claim damages. *Second,* the injured party may attempt to "save the deal" by insisting that the other party perform or by urging retraction of the repudiation (this is similar to seeking assurances if one party suspects that the other party intends not to perform). *Third,* the injured party may ignore the repudiation, wait for the time of performance, and sue if the other party fails to perform. FARNSWORTH ON CONTRACTS, § 8.21, at 540. In cases where the injured party claims that the repudiation "accompanies a breach by nonperformance," as Kinesoft now claims, then "the injured party may treat the breach as total, even if the breach would otherwise have been only partial." *Id.* at 527.

A repudiation can be revoked, but only before the injured party has experienced a material change in condition as a result of the repudiation. FARNSWORTH ON CONTRACTS, § 8.21, at 542-43. "As soon as the injured party has materially changed its position in reliance on the repudiation, . . . it is too late for the repudiating party to retract." *Id.* at 543. If the injured party notifies the repudiating party that it considers the repudiation final, either by statements to that effect or by filing a lawsuit, then it need not show reliance on the repudiation to prevent revocation. *Id.* at 543, n.15. However, if there has been no material change in reliance on the repudiation, and no notice that the

repudiation is considered final, such as by the filing of a lawsuit, then revocation is possible. If the repudiation was by words, then "the repudiating party can nullify it by giving notice of retraction to the injured party." *Id.* at 542. If the repudiation was by deeds, then "the repudiating party can nullify it by correcting the situation that amounted to the repudiation." *Id.* at 543.

### 1.

Kinesoft argues that Mr. Levy's statements during the August 6, 1999 meeting constituted a repudiation by Softbank of the 1997 Agreement. In particular, Kinesoft claims Mr. Levy repudiated the 1997 Agreement, on behalf of Softbank, when he allegedly stated that Softbank was denying Kinesoft's draw request and "would never honor another Draw Request from Kinesoft" (Pl.'s Resp. at 8-9; Pl.'s Add'l Facts ¶ 82). Although the parties never use the word "agent," and the parties further dispute whether a "Draw Request" was made and/or rejected (Defs.' Reply Facts ¶ 82), their dispute raises the threshold issue of whether Mr. Levy was Softbank's agent; if so, there remains the question of whether the statements he made on August 6, 1999 constituted repudiation. The Court finds that both issues raise questions for the jury.[12]

---

[12]Softbank never grapples with the agency questions and instead pursues a blind alley by arguing that Mr. Fisher never made any unequivocal statements that Softbank would refuse to honor its funding obligations under the 1997 Agreement (Defs.' Mem. at 6-7). Softbank's argument is perhaps understandable, since the second amended complaint alleges that Mr. Fisher ratified Mr. Levy's alleged statements in the October 19, 1999 letter (Second Am. Compl. ¶ 24). But, in its brief, Kinesoft abandons that argument and relies solely on Mr. Levy's statements as the words of repudiation (Pl.'s Opp. Mem. 8) – a point Softbank does not address in its reply. The only place where the agency point was addressed was in the briefing on Kinesoft I. There Kinesoft made much of the Court's earlier ruling on a discovery motion in which the Court stated, for example, that "on the facts here . . . there is very little doubt . . . that in fact Mr. Levy was an agent of Softbank[,]" the words "on the facts here" were a very important limitation on that ruling (4/06/00 Tr. at 15). As defendants correctly pointed out, that ruling pertained only to Kinesoft's motion to invade Softbank's attorney-client privilege. The Court decided that motion based on the facts and the law submitted to it by the parties for the resolution of that issue, and addressed only whether Mr. Levy was a member of the "control group" under Illinois law, in particular, under the rules as articulated in *Consolidated Coal Co. v. Bucyrus-Erie Co.*, 89 Ill. 2d 103, 113-120 (1982). *See also Medical Waste Technologies, L.L.C. v. Alexian Bros. Medical Center, Inc.*, No. 97 C 3805, 1998 WL 387706, 1998 WL 387705 (N.D. Ill. June 24, 1998). Thus, the Court's earlier ruling on Kinesoft's motion on the question of attorney-client privilege is not the law of the case regarding Mr. Levy's asserted agency relationship with Softbank for purposes of other issues in this case.

Under Illinois law, the existence of an agency relationship and its extent are questions of fact. *Brunswick Leasing Corp. v. Wisconsin Central, Ltd.,* 136 F.3d 521, 526 (7th Cir. 1998).

> The test of agency is whether the alleged principal has the right to control the manner in which work is carried out by the alleged agent, and whether the alleged agent can affect the legal relationships of the principal.

*Chemtool, Inc. v. Lubrication Technologies, Inc.,* 148 F.3d 742, 744 (7th Cir. 1998) (quoting *Israel v. National Canada Corp.,* 276 Ill. App. 3d 454, 458 (1st Dist. 1995)).

An agent has "actual authority" to act on a principal's behalf when the principal's words or actions (*i.e.*, the principal's "manifestation" of intent) would lead a reasonable person in the agent's position to believe that he or she was so authorized. *See Opp v. Wheaton Van Lines, Inc.,* 231 F.3d 1060, 1064 (7th Cir. 2000) (interpreting Illinois law and the Restatement (Second) of Agency). *See also* Restatement (Third) of Agency, § 1.01 (Draft 2000). Actual authority can be express or implied. Implied authority is that authority which is inferred from the words used, the customs, the nature of the authorization, or the relations of the parties. *Opp.*, 231 F.3d at 1064.

Even in the absence of actual authority, an agent has "apparent authority" to act on the principal's behalf in relation to a particular third party when the words or conduct of the principal would lead a reasonable person in the third party's position to believe that the principal had so authorized the agent. *Id.* at 1065. *See also Anetsberger v. Metropolitan Life Ins. Co.,* 14 F.3d 1226, 1235 (7th Cir. 1994). The difference between actual and apparent authority hinges on who holds the belief in the authority of the agent. If the agent holds the belief, it is actual authority. If the third party holds the belief, it is apparent authority. *Opp,* 231 F.3d at 1064-65.[13]

---

[13] An agency also may be created by estoppel: if a third party justifiably changes position (detrimentally relies) because of a reasonable belief that a person (would-be agent) is authorized by another (would-be principal) to act in a particular manner, the "would-be principal" may be held liable if he is responsible for the erroneous belief. *See Secon*

The Court finds that there is evidence in the record from which a jury reasonably could determine that Mr. Levy was Softbank's agent under a theory of actual authority. *First,* the October 30, 1998 e-mail could be interpreted as a manifestation of an intent by Mr. Fisher, on behalf of Softbank, to make Mr. Levy Softbank's designated agent for purposes of representing Softbank's interests, which could include Softbank's interests in connection with requests for Capital Advances from Kinesoft. The April 26, 1999 e-mail from Mr. Fisher to Kinesoft could be read as a confirmation of that intent. *Second,* the evidence also supports a finding that Mr. Fisher was still in "control" of the relationship between Kinesoft and Softbank, as evidenced, for example, by Mr. Levy's e-mail to and Mr. Sills regarding Kinesoft's proposal to self-fund the Digital Anvil deal, in which Mr. Levy states: "I will be with Ron Fisher tonight and *ask him what he thinks . . . .*" (Pl.'s Ex. W). The rest of the e-mail asks for information that Mr. Levy can convey to Mr. Fisher at that meeting (*Id.*). A jury reasonably could conclude that Mr. Fisher also evidenced his control in his October 19, 1999 letter when he reasserted Softbank's position regarding the 1997 Agreement and attempted to correct what he labeled as a misunderstanding regarding Mr. Levy's "explanation of Softbank's position" (Defs.' Ex. 36).

The Court also finds that a reasonable jury could find an apparent agency relationship here. For example, a jury could conclude that Kinesoft reasonably interpreted Mr. Fisher's statement that Mr. Levy was intended to help the parties "handle" Kinesoft's "requests" more "expeditiously" as a reference to the "future requests for capital" mentioned earlier in the April 26, 1999 e-mail. A jury

---

*Service System, Inc. v. St. Joseph Bank and Trust Co.,* 855 F.2d 406, 417 (7th Cir. 1988). Such responsibility can arise if the would-be principal intentionally or carelessly caused such belief, or if the would-be principal, knowing of such belief and the possibility of detrimental reliance, did not take reasonable steps to notify the relying party of the facts of the situation. *Id.*

also could reasonably conclude that Mr. Levy held himself out as someone with authority to act and speak for Softbank on these matters. Mr. Levy's alleged statements in the August 6, 1999 meeting regarding the Digital Anvil proposal were definitive; they did not indicate any lack of authority to say yes or no to the deal. Moreover, Mr. Levy's August 9, 1999 e-mail to Mr. Fisher summarizing the August 6, 1999 meeting stated that Mr. Levy told Kinesoft: (1) he would not support an investment by Kinesoft into the Playstation 2 venture (which a jury could reasonably conclude was calculated to convey the impression that it was Mr. Levy's approval that Kinesoft would need to obtain a Capital Advance); (2) the Digital Anvil proposal did not fit within the Softbank business; and (3) Softbank was within its "rights to withhold additional investment in anything other than [Softbank's] core strategy of PC based games" (Pl.'s Ex. U). A jury could reasonably conclude that, in the context of Mr. Fisher's prior comments concerning Mr. Levy's status, Kinesoft reasonably believed Mr. Levy had authority to speak for Kinesoft – and that Mr. Fisher did not act to change that impression.[14]

If a jury were to find that Mr. Levy was Softbank's (actual or apparent) agent, the question then would be whether there are disputed issues of material fact regarding whether Mr. Levy repudiated the 1997 Agreement. Plainly there are. Although a number of the parties' disputes about what Mr. Levy said at the August 6, 1999 meeting raise triable issues on the repudiation claim, we focus on one point in particular. In his August 9, 1999 e-mail to Mr. Fisher, Mr. Levy said he informed Kinesoft that Softbank would "withhold additional investment in anything other than *our*

---

[14]We note that whether Mr. Levy in fact became a board member is not material to the question of apparent or actual agency. However, if credited, the evidence that Kinesoft believed (even if mistakenly) that Mr. Levy was a Board member (*e.g.*, Pl.'s Add'l Facts ¶ 78; Defs.' Ex. 33: 08/31/99 Sills e-mail to Levy) would be relevant to the question of apparent agency.

core strategy of PC based games" (Pl.'s Ex. U) (emphasis added). If Mr. Levy was Softbank's agent in making that communication, then that statement could provide a basis upon which a reasonable jury could find repudiation by Softbank. Section 2 of the 1997 Agreement imposes on Softbank an obligation to provide Capital Advances to Kinesoft for the purpose of advancing the business plan of *Kinesoft*, not the business strategies of Softbank.

There are also subsequent e-mail exchanges between Mr. Levy and Kinesoft from which a jury reasonably could find repudiation. For example, in response to Mr. Sills' proposal to fund the Digital Anvil venture using Kinesoft money, Mr. Levy wrote that Softbank had "no appetite" to "do anything" regarding the Digital Anvil deal, and "that will severely constrain you going forward" (Pl.'s Ex. W). Mr. Levy also wrote that "I will not support *any* investment in *anything* that you are not currently doing and until you have success, financial that is, we will be very tight with investment" (*Id.*). Those words, and others like them, provide a sufficient factual basis to raise a triable issue.

Softbank argues that Mr. Fisher's communications of April 26, 1999 and October 19, 1999 confirmed Softbank's intent to honor its funding obligations under the 1997 Agreement, and are thus sufficient to revoke any repudiation that might have been made by Mr. Levy (Defs.' Reply at 5). Of course, Mr. Fisher's April 26 e-mail could not revoke any subsequent repudiation by Mr. Levy, and so we focus on the October 19 letter. Softbank relies on the fact that Mr. Sills admits that the October 19 letter left him with "reservations" concerning whether Softbank intended to perform according to the "words" in the 1997 Agreement (Pl.'s Resp. Facts ¶ 38; Pl.'s Ex. D: Sills Dep., at 565). Softbank's argument might have force if Kinesoft's theory was that Mr. Fisher's October 19 letter constituted the words of repudiation. But that is not the case: Kinesoft claims Mr. Levy's

earlier statements constituted repudiation. Thus, the proper question is whether Mr. Fisher's October 19 letter is sufficiently clear that, as a matter of law, it constitutes a retraction of the alleged repudiation. On this question, Mr. Sill's expressed "reservations" about Mr. Fisher's October 19 letter cuts against Softbank's summary judgment argument.[15]

The Court agrees with Kinesoft that a reasonable jury could decide that Mr. Fisher did not intend to retract Mr. Levy's alleged repudiation, and the October 19 letter reflected Softbank's intent to perform only under its mistaken interpretation of the contract (*i.e.*, its interpretation of "Business Plan") or not at all. *Marriage of Olsen,* 124 Ill.2d at 24. Accordingly, the Court finds that a triable issue is presented by Kinesoft's claim that Softbank repudiated the 1997 Agreement by Mr. Levy's alleged August 6, 1999 comments.

## 2.

For the most part, the disputed facts discussed in conjunction with the allegations of repudiation by Mr. Levy largely overlap on the issue of repudiation by non-performance. We wish to note, however, that the very fact that Softbank declined to fund the Digital Anvil proposal on the merits, applying Softbank's interpretation of its obligations under the relevant agreements, is itself a basis for sending Count I to the jury on the repudiation theory. This is because the denial, as an act of non-performance, could reasonably be construed not only as a denial of the particular Digital Anvil deal, but also more generally as a precursor of things to come.

---

[15]Because there is a genuine issue of material fact regarding whether the October 19, 1999 letter by Mr. Fisher served as a retraction of any repudiation by Mr. Levy, the fact that Kinesoft did not file suit before October 19, 1999, but initially chose to try and save the deal by insisting on performance, is not an election of remedies that bars this suit. *See* FARNSWORTH ON CONTRACTS § 8.22, at 544-45 (prevailing view that injured party's response in trying to save the deal does not amount to an election and that party is not precluded from treating the contract as terminated at any time before a proper retraction).

Statements attributed to both Mr. Levy and Mr. Fisher make this point clear enough to create a dispute on the issue of repudiation. For example, Mr. Levy allegedly stated that "Kinesoft would have no further access to . . . funds for [the Digital Anvil] deal *or any other deal or use*[,]" and "[t]he nature of the use and/or deal was totally irrelevant" (Pl.'s Add'l Facts ¶ 82). Mr. Levy also allegedly stated that "Softbank had no further interest in Kinesoft or the business space Kinesoft was in[;]" "Kinesoft no longer had the right partner[;]" and Softbank "did not have to honor its commitments of funding since Kinesoft was not a leader in [the] interactive entertainment [industry]" and "Softbank had discretionary power over the spending of more than $500,000 by Kinesoft and would not approve any such expenditures going forward" (*Id.*). Mr. Levy also wrote an e-mail to Mr. Fisher indicating that he told Kinesoft that Softbank was "within [its] rights to withhold additional investment in anything other than [its] core strategy of PC based games" (Pl.'s Ex. U). Finally, Mr. Levy's subsequent e-mail statements regarding the self-funding proposal indicate that Softbank did not "have an appetite to do anything" further in terms of funding and warned Kinesoft that this lack of appetite would "severely constrain [Kinesoft] going forward" (Pl.'s Ex. W). In the Court's view, these documents provide sufficient evidence from which a jury could find repudiation of the entire 1997 Agreement by non-performance of its existing and future obligations.

Mr. Fisher's silence during all of these in person and e-mail discussions between Kinesoft and Mr. Levy could be seen by a reasonable jury as a failure to withdraw Mr. Levy's arguable repudiation. But, even without that silence, Mr. Fisher's explicit statements in his October 19, 1999 could be read as a statement that Softbank did not intend to perform either as to the Digital Anvil proposal or any other proposal of its kind under its interpretation of the 1997 Agreement. Together

with the fact that Softbank did not agree to fund the Digital Anvil venture, a jury could find repudiation by non-performance (Defs.' Exs. 35 and 36).

To summarize, Kinesoft's breach of contract claim in Count I raises several ultimate issues on which there are genuine disputes of material fact: (1) whether Kinesoft was excused by Softbank's conduct from submitting a Draw Request that fully complied with all procedural conditions precedent; (2) if so, whether Softbank breached the 1997 Agreement by stating that the Digital Anvil proposal, on the merits, did not qualify for a Capital Advance; and (3) whether Softbank repudiated the 1997 Agreement in its entirety. Because these issues must be resolved by the jury, Softbank's summary judgment motion is denied as to Count I.

## V.

In Count II, Kinesoft alleges that Softbank breached an implied covenant of good faith and fair dealing in the Shareholders Agreement by invoking Section 2(c) of the Agreement to prevent Kinesoft from using its own funds to enter into the Digital Anvil venture, thus advancing the interests of Softbank at the expense of the interests of Kinesoft (Second Am. Compl. ¶ 38). Kinesoft also alleges that Softbank repudiated its existing and future obligations under the Shareholders Agreement by the statements and actions of its Board members and designated representatives (*Id.* at ¶ 39). For the reasons that follow, the Court concludes that Softbank is not entitled to summary judgment on Count II.

## A.

Section 2(c) of the Shareholders Agreement provides that capital expenditures of $500,000 or more cannot be undertaken by Kinesoft unless approved by all of the directors present at a Board of Directors meeting (Defs.' Ex. 4). Section 2(b) defines a quorum for a Board meeting as consisting

of at least two directors designated by Kinesoft and one designated by Softbank. Thus, under the Shareholders Agreement, Softbank effectively could veto a capital expenditure of more than $500,000 by Kinesoft.

The Shareholders Agreement expressly provides that it will be governed and construed in accordance with Illinois law (Shareholders Agreement, § 7). Under Illinois law every contract contains an implied covenant of good faith and fair dealing, which requires a party to exercise its discretion in performing a contractual obligation "reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Perez*, 301 Ill. App. 3d at 424. In this case, the summary judgment record reveals a genuine dispute of material fact as to whether Softbank exercised its discretion in good faith under Section 2(c) of the Shareholders Agreement. Mr. Levy's statements in his September 8, 1999 e-mail and Mr. Fisher's statements in his October 19, 1999 letter appear to invoke Softbank's rights under the Shareholders Agreement to block Kinesoft's ability to use its own funds to pursue the Digital Anvil venture. Whether Softbank did so in good faith rather than for an improper purpose is for the jury to decide.

Softbank argues that "[i]t is undisputed that Kinesoft never called a board meeting to consider whether it should use its own capital to fund a transaction with Digital Anvil" (Defs.' Mem. at 7), and that Softbank therefore could not have breached any duty because Softbank "never exercised its discretion under Section 2(c) of the Shareholders Agreement, *i.e.*, it never voted to veto the Digital Anvil proposal at a Kinesoft board meeting" (Defs.' Mem. at 8). However, Mr. Sills' August 31 and September 8, 1999 e-mails asked Mr. Levy whether Softbank would approve Kinesoft's use of its own money to fund the Digital Anvil deal, and the written responses from Mr. Levy and Mr. Fisher were a clear and unequivocal "no" (Pl.'s Ex. W; Defs.' Ex. 36). A jury

reasonably could find that Kinesoft did not call a Board meeting because Kinesoft concluded that, in light of Softbank's position twice expressed in writing, to do so would have been a futile exercise. And, if so, the absence of a Board meeting is not fatal to Kinesoft's claim. *See, e.g., E.B. Harper*, 104 F.3d at 919 (a party to whom a condition is owed cannot claim failure of the condition if that party is responsible for hindering the occurrence of the condition through "uncooperative conduct").

Softbank protests that without a Board meeting, "there is no way to know how Softbank ultimately would have voted" (Defs.' Reply at 7). But Softbank offers no contemporaneous evidence that Softbank might have changed its view at a formal meeting, and all the evidence indicates that with or without a formal meeting, Softbank's vote had already been cast in favor of rejecting the Digital Anvil self-funding idea – as Softbank admits in its brief, when it states that "Kinesoft informally asked Softbank for its views on the self-funding of the Digital Anvil venture (at a point when it already knew that Softbank disagreed with the venture) . . ." (Defs.' Reply at 7). In any event, whether Kinesoft fairly could conclude that a formal Board meeting would have been a useless exercise is for the jury to decide. Summary judgment cannot issue on Kinesoft's claim of breach of the Shareholders Agreement.

**B.**

As for Kinesoft's repudiation theory, Kinesoft argues that Mr. Fisher's statements in his October 19, 1999 letter "represent[] a clear statement that Softbank did not intend to perform its obligations under the Shareholders' Agreement" and "amount[] to an anticipatory repudiation of [that] . . . Agreement" (Pl.'s Resp. at 10). Mr. Fisher's statements in his October 19, 1999 letter invoke Section 2(c) of the Shareholders Agreement as authority for his position that Softbank was not obligated to "rubber stamp" any corporate action by Kinesoft regarding the venture -- whether

that be through a Capital Advance under the 1997 Agreement or by self-funding under the Shareholders Agreement. These statements are unequivocal; they are based on Softbank's interpretation of the Shareholders Agreement; and they are subject to the claim of repudiation raised by Kinesoft, because they are evidence of an intent not to perform. Softbank's only real response is again to assert that there was no repudiation of the Shareholders Agreement, because there was no formal Board meeting or formal vote on Kinesoft's request. But, for the reasons stated above, the issue is not one that the Court can resolve on summary judgment.

Thus, we come full circle to the question that lies at the heart of the claim in Count II, namely, whether Softbank was obliged to permit Kinesoft to fund the Digital Anvil deal using Kinesoft's own money, or whether it could choose to say "no" and, if so, under what circumstances and for what reasons. Because there is sufficient disputed evidence in the record to create a triable issue, Kinesoft's claim that Softbank's conduct breached or repudiated the Shareholders Agreement, the Court denies summary judgment as to Count II.

## VI.

In Count III, Kinesoft alleges that Softbank is liable for tortious interference with prospective economic advantage. Kinesoft claims that "Softbank, by and through its agents and representatives, Ronald D. Fisher and Jordan Levy, deliberately interfered with Kinesoft's legitimate expectancy with NewCo and with Digital Anvil and intentionally prevented that expectancy from ripening into a valid business relationship" (Second Am. Compl. ¶ 44). The specific kinds of interference alleged include: "[d]enying the Playstation 2 Draw Request"; "[p]reventing Kinesoft from funding the Playstation 2 joint venture with its own funds"; "[d]eliberately interfering with . . . every effort by Kinesoft to fund the Playstation 2 Joint Venture in order to frustrate Kinesoft's business and . . .

force the termination of Kinesoft's business relationship with Softbank"; and "[o]therwise interfered with the efforts of Kinesoft to complete and to implement the Playstation 2 Joint Venture with Digital Anvil" (*Id.*). Kinesoft further claims that Softbank "obtained and held the ability to influence, to control, to hinder, and to interfere with Kinesoft's business operations" pursuant to the Shareholders Agreement, which made Softbank a shareholder and business partner to Kinesoft, and the 1997 Agreement, which made Softbank a lender to Kinesoft (*Id.* ¶¶ 48-51).[16] Softbank has moved for summary judgment on Count III, contending that the undisputed evidence establishes that Kinesoft cannot prove the elements of a tortious interference claim under Illinois law (Defs.' Mem. at 8).

In Illinois, the elements of a tortious interference with prospective economic advantage claim are as follows: (1) plaintiff must have a reasonable expectancy of a valid business relationship; (2) defendant must know about it; (3) defendant must intentionally interfere with the expectancy, and so prevent it from ripening into a valid business relationship; and (4) the intentional interference must injure the plaintiff. *See Schuler v. Abbott Laboratories,* 265 Ill. App. 3d 991, 994 (1st Dist. 1993). *See also Douglas Theater Corp. v. Chicago Title & Trust Co.*, 266 Ill. App. 3d 1037, 1047 (1st Dist. 1994); *Eisenbach v. Esformes,* 221 Ill. App. 3d 440, 444 (2d Dist. 1991). Moreover, under Illinois law, a "[p]laintiff states a cause of action only if he alleges a business expectancy with a specific third party," and further, "allege[s] action by the interfering party directed towards the party with whom the plaintiff expects to do business." *Schuler,* 265 Ill. App. 3d at 995. *See also Silk v. City of Chicago,* No. 95 C 0143, 1997 WL 790598, * 19 (N.D. Ill. 1997) (citing Illinois cases).

---

[16] Although paragraphs 48-51 are pled as part of Count IV, alleging a breach of fiduciary duty by Softbank, these specific allegations are pled more generally earlier in the complaint, and incorporated by reference in Count III (Sec. Am. Compl. ¶¶ 7, 11, 13, 19-25, and 41).

Here, the allegations of the second amended complaint all identify conduct allegedly directed toward Kinesoft, not Digital Anvil; and in its summary judgment papers, Kinesoft points to no evidence that Softbank's alleged conduct in this case was directed towards Digital Anvil, the third party. Thus, under Illinois law, Kinesoft's claim would fail, requiring summary judgment in Softbank's favor. Kinesoft's response is that Texas law and not Illinois law applies, and that Texas does not require the defendant's alleged interfering conduct to be directed to the third party with whom the plaintiff expects to do business. We disagree on both scores.

*First*, the Court finds that in the event a "true conflict" between Texas and Illinois law existed, Illinois law would apply. Section 5.06 of the 1997 Agreement specifically provides that Illinois law will govern disputes under that contract, and in *First Commodity Traders, Inc. v. Heinhold Commodities, Inc.*, 591 F. Supp. 812, 815 (N.D. Ill. 1984), the court held that such a provision also should govern a tortious interference claim that is "closely related to the parties' contractual relationship." That plainly is the case here: the same conduct that is the basis of the breach of contact claims in Counts I and II is also the basis of the tortious interference claim.[17]

---

[17]Under a choice of law analysis applying the "most significant relationship test" (which applies under both Illinois and Texas law), the Court also finds that Illinois law would govern because, although Kinesoft's principal place of business is now Texas, the parties' relationship is centered in Illinois. In Illinois, courts apply the most significant relationship test by using the principles set forth in the Restatement (Second) of Conflicts of Laws §§ 6 and 145. The Restatement (Second) § 145 provides, *inter alia*, that the contacts to be taken into account in applying the principles of § 6 and determining the applicable law include the place where the injury occurred; the place where the conduct causing the injury occurred; the domicile, residence and place of incorporation and business of the parties; and the place where the relationship between the parties is centered.

Here, although Kinesoft is doing business in Texas, its place of incorporation is Illinois; its majority shareholder, Mr. Sills, resides in Illinois; and the underlying agreements which form the basis for this lawsuit were executed while Kinesoft was doing business in Illinois. In fact, the agreements specify that the parties intended for Illinois law to govern any disputes arising under those contracts. In these circumstances, although Kinesoft may have been doing business in Texas at the time of the alleged injuries, Kinesoft can be said to have been in both Illinois and Texas at the time of the injuries alleged here. Thus, we cannot determine the place of injury with precision; and, even if we could, we do not give place of injury "presumptive importance," as Kinesoft urges (Pl.'s Opp. Mem. at 12 (citing cases)), because we find that the parties' relationship with respect to the two contracts at issue is centered in Illinois, and Illinois has the most significant interest in applying its own law, especially since the parties agreed that it would apply.

55

*Second*, we are not convinced a "true conflict" exists. Texas law, unlike Illinois law, does not clearly state whether a claim for tortious interference with business relations requires the defendant's allegedly interfering conduct to be "directed toward" the third party with whom the plaintiff expects to do business. But a fair reading of the Texas authorities shows that where tortious interference is found to have occurred, the interference by the defendant is with the third party. Unlike Kinesoft (Pl.'s Opp. Mem. at 10, n.7), we assign no significance to the fact that in Illinois, the claim is labeled "Tortious Interference with Prospective Economic Advantage," while in Texas, the claim is labeled "Tortious Interference with Business Relations." *See, e.g., Tarleton State Univ. v. Rosiere,* 867 S.W.2d 948, 952 (Tex. App. 1993). Accordingly, were it necessary to decide the conflicts question, the Court would hold that there is no true conflict is presented here. And, where the substantive law of the interested states is essentially the same, there is no conflict and the law of the forum controls. *See Dearborn Ins. Co. v. International Surplus Lines Ins. Co.,* 308 Ill. App. 3d 368, 373 (1st Dist. 1999).

*Third*, any conflict between Illinois and Texas law on the subject of tortious interference is irrelevant, since Kinesoft has not stated a claim for tortious interference under Texas law even as Kinesoft reads it. What plaintiff alleges here is a tortious interference claim based on non-feasance or non-performance by Softbank under the Shareholders Agreement and the 1997 Agreement. However, under Texas law an alleged failure to perform is a breach of contract claim, not a tort – even if it has the effect of interfering with, hindering or preventing a reasonable business expectancy from ripening into a valid business relationship. *Southwestern Bell Telephone Co. v. DeLanney,* 809

---

*See generally In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979,* 644 F.2d 594, 611 (7th Cir. 1981) (presumption that local law of state where injury occurred should govern unless another state has a more significant interest); *Ingersoll v. Klein,* 46 Ill.2d 42, 45 (1970) (same).

S.W.2d 493, 494-95 (Tex. App. 1991). *See also* W. PROSSER, D. DOBBS, R. KEETON & D. OWEN, PROSSER AND KEETON ON THE LAW OF TORTS § 92, at 656-67 (5th ed. 1984).

Kinesoft argues that these authorities are inapplicable here because Softbank's "duty . . . to refrain from interfering with Kinesoft's business relations does not arise from the contracts between them . . . it arises from Texas law and is independent of the duties imposed by those contracts" (Pl.'s Opp. Mem. at 14). This argument misses the mark. All of tort law, including Texas tort law, imposes obligations upon every citizen to refrain from harming others and others' property. To state that Texas law imposes duties on Softbank apart from the subject matter contracts does not answer the question presented here: whether Softbank's alleged misconduct (and any injury flowing from it) can be tied to a duty arising under contract or tort law.

In this case, the only alleged misconduct and injury arises from the contractual relationship between Softbank and Kinesoft. Softbank's duties, if any, arise under the Shareholders Agreement and the 1997 Agreement, and Kinesoft's damages, if any, stem from the economic loss caused by Softbank's alleged failure to perform under those agreements. As was the case in *DeLanney,* so it is the case here: Kinesoft seeks to recover the benefit of its alleged bargain with Softbank under their agreements. *See DeLanney,* 809 S.W.2d at 495 (citing W. PROSSER, D. DOBBS, R. KEETON & D. OWEN, PROSSER AND KEETON ON THE LAW OF TORTS § 92, at 656-67 (5th ed. 1984) (obligations in tort are imposed by the law, apart from the agreement and intention of the parties; when the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract; "recovery of intangible economic losses is normally determined by contract law; and . . . there is no tort liability for nonfeasance, *i.e.,* for failing to do what one has promised to do in the absence of a duty to act apart from the promise made"). *See also Reed,* 711 S.W.2d at 618 (nature

of injury usually determines which duty or duties are breached). That does not create a tort claim under Texas law.

Under either Illinois or Texas law, summary judgment must be entered in favor of Softbank on Count III.

## VII.

In Counts IV and V, Kinesoft alleges breaches of fiduciary duty by Softbank and by Mr. Fisher, personally. To state a claim for breach of fiduciary duty, "it must be alleged that a fiduciary duty exists, that the fiduciary duty was breached, and that such breach proximately caused the injury of which the plaintiff complains." *Neade v. Portes,* 193 Ill. 2d 433, 502 (Ill. 2000). "A fiduciary relationship imposes a general duty on the fiduciary to refrain from 'seeking a selfish benefit during the relationship.'" *Id.* (citing *Kurtz v. Solomon,* 275 Ill. App. 3d 643, 651 (1st Dist. 1995)). The individuals who control a corporation owe a fiduciary duty to the corporation and its shareholders. *Levy v. Markal Sales Corp.,* 268 Ill. App. 3d 355, 364 (1st Dist. 1994). The directors and officers of a corporation have a duty "to deal openly and honestly with each other. . . and to exercise the utmost good faith and honesty in all dealings and transactions." *Id.* at 365. Officers cannot place themselves in a position where their own individual interests would interfere with the performance of their duties to the corporation, and they cannot use their positions for personal gain. *Id.* at 365.

Softbank seeks summary judgment on Counts IV and V on the grounds that: (1) "the undisputed evidence demonstrates that Softbank did not breach [the 1997 and Shareholder] agreements, and thus there is no factual basis for Kinesoft's breach of fiduciary duty claims;" and (2) because Softbank did not breach those agreements (and therefore "lived up to its contractual obligations"), then "it (and Mr. Fisher) necessarily did not breach any fiduciary duty to Kinesoft"

(Defs.' Mem. at 12). Since the Court has concluded that the breach of contract claims survive summary judgment, the threshold premise of Softbank's argument fails, and for that reason alone the motion for summary judgment must be denied.

## VIII.

We now turn to Softbank's attack on Kinesoft's damages claims. In the final pretrial order, Kinesoft claims $88,688,680 in damages (before reduction to present value), which fall into the following categories: (a) $9,227,903 in damages for money alleged still owed under the 1997 Agreement; and (b) $79,460,777 in economic harm attributable to the inability to publish current PC CD-Rom titles ($3,671,737), the lost opportunity in connection with three lost new PC CD-Rom game titles ($7,037,777) and two lost Playstation 2 titles ($18,395,745), and the long term continuing effect on Kinesoft's earnings ($50,355, 518) (*see* Final Pretrial Order, § VII, at 8). In addition, Kinesoft seeks an award of punitive damages.

Softbank seeks summary judgment on each of these damages claims. We address each argument in the order that Softbank has raised it.

## A.

Kinesoft's lost profits claims are based on the theory that, but for Softbank's breach of the 1997 and Shareholders Agreements and breach of fiduciary duty, Kinesoft would have earned profits from the sale of two partially developed and other undeveloped games for use with PC CD-Roms and Playstation 2 (Defs.' Facts ¶ 48). Softbank has moved for summary judgment on the lost profits claims on two grounds. *First*, Softbank contends that Illinois law governs this damage issue, and that under Illinois law, Kinesoft may not recover lost profits because it is a "new business" and lacks any profit history (Defs.' Mem. at 12-16). *Second*, Softbank argues that even if the new business

rule were inapplicable, Kinesoft's lost profits claims are too speculative to survive summary judgment (*Id.*). For the reasons that follow, Softbank's motion for summary judgment is granted on the lost profits claims.

## 1.

Softbank's legal argument is that Illinois law imposes a bar to the recovery of lost profits in this case based on Kinesoft's status as a "new business" without a track record of profit, and with a new and untested product. Kinesoft's threshold assertion that Illinois does not have such a rule is contradicted by numerous – and recent – decisions recognizing the existence of this rule. *See, e.g., Stuart Park Assocs. Ltd. Partnership v. Ameritech Pension Trust,* 51 F.3d 1319, 1328 (7th Cir. 1995); *Alexander Binzel Corp. v. Nu-Tecsys Corp.,* No. 91 C 2092, 2000 WL 310304, at * 13 (N.D. Ill. Mar. 24, 2000); *Expino v. Advo, Inc.,* 95 C 0073, 1997 WL 176578, at * 2-3 (N.D. Ill. Apr. 4, 1997); *Villalba v. Consolidated Freightways Corp.,* No. 98 C 5347, 2000 WL 1154073, at * 2-3 (N.D. Ill. Aug. 14, 2000). Under Illinois law, a new business, or an existing business with a new product, cannot recover lost profits because the future profits of a new business cannot be ascertained with any degree of certainty. *Stuart Park,* 51 F.3d at 1328. "The reason for the rule is that a new business has yet to show what its profits actually are." *SK Hand Tool Corp. v. Dresser Indus., Inc.,* 284 Ill. App. 3d. 417, 427 (1st Dist. 1996).

The Court finds equally unavailing Kinesoft's argument that Texas law, which does not have a new business rule, applies to its damages claim. Kinesoft never explains why Texas law should apply in this case, when both the 1997 Agreement and the Shareholders Agreement contain specific choice of law provisions selecting Illinois law. Moreover, Kinesoft concedes that the substantive contract and fiduciary duty counts that are the springboard for this lost profits claim are governed

by Illinois law, and we follow the general rule is that "remedial issues are so bound up with substantive issues that they ought to be decided according to the same law that governs the substantive issues." *Patton v. Mid-Continent Sys., Inc.*, 841 F.2d 742, 750 (7th Cir. 1988) (citing LEFLER, AMERICAN CONFLICTS LAW § 126 (3d ed. 1977)). *See also* RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 207 (measure of recovery for breach of contract to be determined by application of same rules used for substantive claims and contractual choice of law provision is to be given effect).[18]

Thus, the Court finds that Illinois law applies, which requires that we turn to the question of whether the new business rule applies to Kinesoft on the facts of this case. Kinesoft seeks to create a genuine dispute of material fact on the applicability of the rule by saying there is evidence that Kinesoft: (1) has a "an imminent profit history" based on future sales of its products to a publisher; (2) has maintained business operations for over five years; and (3) "is a collection of individuals who each have track records of success," and that these track records permit Kinesoft's experts "to project the likelihood of Kinesoft's success" for purposes of computing lost profits (Pl.'s Opp. Mem. at 17-

---

[18]The cases Kinesoft cites to support its view that different laws may govern substantive claims and damages claims are not persuasive here. In *Landis & Gyr Powers, Inc. v. Powers U.K., Ltd.*, No. 90 C 3027, 1990 WL 165323, *2 (N.D. Ill. Oct. 25, 1990), the choice of law provision stated that "construction and validity [of the Agreement] shall be determined in accordance with the laws of the State of Illinois, U.S.A." The court found that an arbitrator did not ignore Illinois law when he interpreted that clause to mean that Illinois law did not govern the damage award in that case, even though it governed liability. *Landis* is distinguishable from this case because it was an arbitration case and a court has "no power to reach and determine the merits of arbitration awards merely because of disagreement, even strong disagreement, with the arbitrator's interpretation of the contract." *E.I. DuPont de Nemours and Co. v. Grasselli Employers Independent Assoc., Inc.*, 790 F.2d 611, 614 (7th Cir. 1986), *disapproved on other grounds, United Paperworks International Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 35 n.7 (1987).

In *The Home Insurance Company v. Service America Corp.*, No. 86 C 4165, 1986 WL 13762, * 1 (N.D. Ill. Dec. 2, 1986), the court stated a conclusion specific to that case, namely, that the liability issues would be governed by one law and the punitive damages claims by another. We do not dispute the general principle of "depacage," which holds that the rules of different states may be applied on the basis of the precise issues involved. *In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979*, 644 F.2d 594, 610-11 (7th Cir. 1981). We simply disagree that the liability and damages issues deserve different treatment here.

61

19).  However, these arguments do not raise any genuine issue concerning the applicability of the new business rule.

As for the first argument, it would be pure speculation for the Court to find that Kinesoft is not a "new business" based on a single *pending* sale to a publisher of *some* of the games for which it seeks lost profits, especially when there is no evidence in the record that this sale has been consummated. That kind of speculation does not create a triable issue.  As for the second argument, there might be an issue raised by Kinesoft's five-year existence if Kinesoft previously had sold any of the types of games currently in development.  But Kinesoft does not fall within this exception because, despite its five years of existence, Kinesoft can point to no sales or profits prior to the defendants' alleged breach.  As for its third argument, the new business rule does not except those businesses, existing or new, with a product in a new line simply because that product is created by "a collection of individuals" who in previous endeavors have "track records of success." *Stuart Park,* 51 F.3d 1319, 1328 (7th Cir. 1995) (rejecting claim that prior successes with other similar business ventures establishes basis for future success and recovery of lost profits for that success, and holding that prior successes do not provide "a self-evident basis for generalization"); *see also Drs. Selke & Conlon, Ltd. v. Twin Oaks Realty, Inc.,* 143 Ill. App. 3d 168, 174 (2d Dist. 1986) (past successes with similar products or similar businesses is not sufficient to allow calculation of future lost profits on new product or new business).  Any past successes of the individuals employed by Kinesoft related to other computer games or lines of business is not a sufficient basis upon which the Court can find that Kinesoft's claims for its undeveloped products fall outside the scope of Illinois' new business rule.

Kinesoft also argues that even if the new business rule would otherwise apply, Kinesoft's lost profit claims fit within recognized exceptions to it. One exception cited by Kinesoft is for a new business that had some profit record established prior to the alleged breach. *See Malatesta*, 186 Ill. App. 3d at 621-22 (plaintiff prevented from acquiring car dealership could recover lost profits under exception to new business rule because there was evidence from person who owned and operated dealership as to that businesses' profits both prior and subsequent to the alleged breach); *Drs. Sellke & Conlon, Ltd., v. Twin Oaks Realty, Inc.,* 143 Ill. App. 3d 168, 174 (2d Dist. 1986) (noting that "long-standing rule in Illinois is that lost profits may be a measure of damages where a business is interrupted, but the business must have been established prior to the interruption so that the evidence of lost profits is not speculative"). This exception does not apply here because Kinesoft did have a profit history prior to the breach.

The second exception cited by Kinesoft is based on *Milex Products, Inc. v. Alra Laboratories, Inc.,* 237 Ill. App. 3d 177, 191-92 (2d Dist. 1992). In that case, the plaintiff, a new business, recovered lost profit damages for a breach of contract to manufacture a new pharmaceutical drug that it had not previously marketed or sold, but which had been sold by its competitors for many years prior to the alleged breach of contract. The court allowed the plaintiff to recover lost profits based on expert analyses estimating the profits made by its competitors prior to the breach. The court found that such estimates were not based on speculation or conjecture because plaintiff's expert testified that the lost profits calculations were based upon actual products sold in the marketplace and pointed to authoritative sources for the data used for those calculations. The Court stated:

> [w]hile the product is a new one, the evidence showed it to have an established market. Given that fact, together with [plaintiff's expert's] testimony, we conclude that the proof of lost profits was neither speculative nor the product of conjecture but was based upon a reasonable degree of certainty.

*Id.* at 193. The problem with Kinesoft's resort to this exception is that in projecting lost profits, Kinesoft's own expert gave no consideration to "any analysis of a comparable company selling comparable games" (Defs.' Facts ¶ 53). Without such a comparison, there is no predicate for applying the *Milex* exception.

The Court is mindful of Kinesoft's argument that its lost profits analysis is too "complex" to be explained and defended in Kinesoft's summary judgment brief (Pl.'s Opp. Mem. at 19 n. 14). But that argument is not good enough: a party may not survive a summary judgment motion by promising that it will explain the triable issue later. Rather, "[a] party seeking to defeat a motion for summary judgment is required to 'wheel out all its artillery to defeat it.'" *Caisse Nationale de Credit v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) (quoting *Employers Ins. of Wausau v. Wachs Aviation Ins. Agency*, 846 F. Supp. 677, 685 (N.D. Ill. 1994)). A party who fails to do so risks entry of summary judgment.

In this case, Softbank has offered undisputed facts to show that the Illinois new business rule applies, and in the ordinary cause would bar Kinesoft's lost profits claims. It is Kinesoft that argues the rule should not apply; it thus was incumbent on Kinesoft to point to disputed facts in the record to create a triable issue on that point. Kinesoft has failed to do so.

**2.**

Even without a "new business" rule, Kinesoft still would be limited to pursuing damages claims that can be "proved with a reasonable degree of certainty." *Wilmette Partners v. Hamel*, 230

Ill. App. 3d 248, 263 (1st Dist. 1992). Softbank has pointed to substantial undisputed evidence that indicates Kinesoft's lost profits claims fails to meet that standard. Kinesoft's own experts have conceded that many games are unsuccessful (Defs.' Facts ¶ 42); that the "fickle nature of consumers" and the "changing nature of the industry" make it "difficult to forecast success or failure" (*Id.*); and that, without a track record of success, it is difficult to predict whether a new title issued by a particular company will be successful (Defs.' Facts ¶ 45). Moreover, Digital Anvil, Kinesoft's prospective partner in the proposed venture, said it was not possible to generalize whether a particular Playstation 2 game would be successful "without knowing more about that title" (Defs.' Facts ¶ 44); projections about how such a game would sell would be "speculation and conjecture" (Defs.' Facts ¶ 43).

These statements by witnesses with no ax to grind against Kinesoft, together with Kinesoft's lack of a track record, are strong evidence that any projection of lost profits would be speculative. Kinesoft has provided the Court with no contrary evidence sufficient to raise a genuine fact dispute but, has argued that because Softbank is a wrongdoer Kinesoft should be given "a fair amount of leeway in proving the amount of damages" (Pl.'s Opp. Mem. at 21). To be sure, if Kinesoft had proceeded with the Digital Anvil deal, then there might be no need to guess about how profitable (or not) it would have been. Thus, there is some force to Kinesoft's argument that if the jury finds Softbank wrongfully denied a Capital Advance or blocked Kinesoft's use of its own funds for that deal, Softbank should not benefit from the uncertainty that its conduct created. But the argument does not have so much force that it overrides the bedrock principle that damages may not be speculative, and must be proven with reasonable certainty. "Leeway" is one thing; but what Kinesoft seeks here is a license to speculate, which it is not entitled to have.

On the summary judgment record presented, Kinesoft's lost profits claim cannot survive.

**B.**

The parties agree that Kinesoft's claim for compensatory damages is premised solely on Softbank's alleged repudiation of the 1997 Agreement (Defs.' Facts ¶ 50). Softbank's motion for summary judgment seeks to eliminate Kinesoft's compensatory damages claim on the basis that a "monetary award . . . is not available on a repudiation claim" under the Restatement (Second) of Contracts, § 253, comment c, because Softbank has already received all of the agreed exchange for its promise to fund appropriate requests by Kinesoft under the June 1997 Agreement (*i.e.*, the release of liability under the early Game Porting Agreement) (Defs.' Mem. at 17). Kinesoft accepts Softbank's position that it has fully performed under the 1997 Agreement, but argues that it was entitled to treat the 1997 Agreement as terminated and to sue for monetary damages once the facts showed that Softbank intended to repudiate the contract (Pl.'s Opp. Mem. at 23).

The Restatement 2d of Contracts, § 253(1) states:

### § 253. Effect of a Repudiation as a Breach and on other party's duties

(1)   Where an obligor repudiates a duty before he has committed a breach by non-performance **and** before he has received all of the agreed exchange for it, his repudiation alone gives rise to a claim for damages for total breach.

\* \* \*

(emphasis added).

The comment that Softbank relies on, comment c, states in relevant part:

*c. Scope.* If an obligor repudiates under § 250 or § 251 before he has received all of the agreed exchange for his promise, the repudiation alone gives rise to a claim for damages for total breach under Subsection (1). . . . However, it is one of the established limits on the doctrine of "anticipatory breach" that an obligor's repudiation alone, whether under § 250 or § 251, gives rise to no claim for damages

at all if [the obligee] has already received all of the agreed exchange for it. The rule stated in Subsection (1) does not, therefore, allow a claim for damages for total breach in such a case.

Softbank's argument is premised on its application of the Restatement (Second) of Contracts, § 253 comment c, to its versions of the facts surrounding the repudiation claim. In other words, Softbank contends that Kinesoft's claim is for "anticipatory repudiation" – which is addressed by § 253 of the Restatement (as well as §§ 250-251). However, the first comment to § 253, comment a, states as follows:

> If there is "a breach by non-performance, in addition to the repudiation under § 250 or § 251[,] the breach is not one by repudiation alone and the rules stated in § 243 rather than those stated in Subsection (1) apply. . . .

And, Section 243 provides in relevant part as follows:

> . . . a breach by non-performance accompanied or followed by a repudiation gives rise to a claim for damages for total breach.

RESTATEMENT (SECOND) OF CONTRACTS § 243(2), at 250.

Plainly, repudiation including non-performance is one of Kinesoft's theories of repudiation (Pl.'s Opp. Mem. at 8 n.4), and the Court has held that there are genuine issues of disputed fact on this theory (*see* pp. 48-50, *supra*). Thus, by reading the issue of non-performance out of the repudiation claim, Softbank starts from a flawed premise and thus proceeds to an erroneous conclusion.[19] Since the disputed facts, if decided in favor of Kinesoft, could give rise to liability for

---

[19]In its reply memorandum, Softbank cites to *Kozasa v. Guardian Electric Manufacturing Co.,* 99 Ill. App. 3d 669, 674 (1st Dist. 1981), in support of its position that a claim for monetary damages is unavailable as a matter of law where the aggrieved party has fully performed. *Kozasa* holds that "the doctrine of anticipatory repudiation is inapplicable where the plaintiff has completely performed and the defendant has not." *Id.* However, this holding is consistent with the Court's reading of the Restatement (Second) of Contracts, § 253, which states that where the facts give rise to a claim of breach by repudiation and non-performance, then § 243 rather than § 253 applies, and the aggrieved party may sue for "total breach" if the facts support such a claim.

breach of contract under both of Kinesoft's theories, elimination of a compensatory damages claim before these facts are resolved would be premature. The Court therefore denies Softbank's motion for summary judgment with respect to Kinesoft's compensatory damages claim.

## C.

Finally, Softbank seeks summary judgment on Kinesoft's punitive damages claims. We agree that Kinesoft's contract claim (Counts I and II) cannot support its punitive damages claim. In Illinois, the general rule is that "punitive damages are not recoverable for breach of contract." *Morrow v. L.A. Goldschmidt Assocs., Inc.*, 112 Ill.2d 87, 94 (Ill. 1986) (citing cases). The rationale for this rule is simple: "[t]he sole purpose of contract damages is to compensate the nonbreaching party, and punitive damages are not available even for a 'wilful' breach of contract." *Id.* As with all "general" rules, there are exceptions. One exception to the rule is when the conduct causing the breach of contract is also a tort, and there are allegations that this "tortious" conduct was willful and wanton and/or malicious. *Id.* Punitive damages are available for tortious conduct, even if this tortious conduct can also constitute both a breach of contract and a tort. *Id.* at 96. But, where the allegations in a complaint, such as the one here, simply characterize the conduct causing the alleged breach of contract as "willful and wanton," there is no independent tort alleged which would justify the imposition of punitive damages on the contract claims.

Under Illinois law, however, Kinesoft's breach of fiduciary duty claims (Counts IV and V) can be the basis for punitive damages. In Illinois, a breach of fiduciary duty claim does not arise under tort law but is instead "controlled by the substantive laws of agency, contract and equity." *Kinzer v. City of Chicago,* 128 Ill. 2d 437, 445 (Ill. 1989) (explicitly rejecting the view expressed in the Restatement (Second) of Torts § 874). Nonetheless, it is well settled that "a breach of

fiduciary duty may warrant the imposition of punitive damages." *In re Estate of E. Davis Wernick*, 127 Ill. 2d 61, 84 (Ill. 1989). *See also Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33, 80 (Ill. 1994) (affirming punitive damages award for breach of fiduciary duty, holding that "punitive damages are permissible where a duty based on a relationship of trust is violated . . . or malice or willfulness are shown"); *Levy v. Markal Sales Corp.*, 268 Ill. App. 3d 355, 379 (1st Dist. 1994) (affirming punitive damages award, explaining that "punitive damages are appropriate to punish and deter conduct where the defendant is guilty of an intentional breach of fiduciary duty") (quoting *Obermaier v. Obermaier*, 128 Ill. App. 3d 602, 610 (1st Dist. 1984); *Duignan v. Lincoln Towers Ins. Agency, Inc.*, 282 Ill. App. 3d 262, 271-72 (1st Dist. 1996) (in affirming award of punitive damages for breach of fiduciary duty, stated that "[p]unitive damages may be awarded for a violation of duty springing from a relation of trust or confidence," if the defendant's acts are done with "an evil motive or a reckless indifference to rights of others"). The factual disputes raised in the briefing and discussed at length above preclude the Court from saying, as a matter of law, that Kinesoft cannot proceed with its punitive damage claim insofar as it is based on breach of a fiduciary duty.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (Doc. # 47) is granted in part and denied in part. The Court grants the motion as to Count III of the second amended complaint, and as to the claims for lost profits. The Court denies the motion as to Counts I, II, IV and V of the second amended complaint, as well as the claim for compensatory and punitive damages.

The matter is set for a status hearing on February 27, 2001 at 9:00 a.m.   At that time, the Court will set a trial date and a schedule for filing motions in limine, proposed voir dire questions, and jury instructions.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated:   February 16, 2001